**DIRECT SATELLITE COMMUNICATIONS, INC., Canetic Corporation, Chanticleer Community Association, the Chanticleer Venture, La Bonne Vie Association At Echelon, the Mews at Chanticleer Homeowners Association, and La Bonne Vie Condominium Association, Inc., Plaintiffs,**

v.

**The BOARD OF PUBLIC UTILITIES and Office of Cable Television, an agency of the State of New Jersey and a division thereof, NYT Cable TV, a division of The New York Times Company, and the State of New Jersey and Irwin I. Kimmelman, Attorney General of New Jersey, Defendants,**

and

**New Jersey Cable Television Association, Defendant-Intervenor.**

Civ. A. No. 84–4990.

United States District Court, D. New Jersey.

Aug. 29, 1985.

Vincent J. Sharkey, Jr., Riker, Danzig, Scherer, Hyland & Perretti, Morristown, N.J., and Phillip L. Spector, Goldberg & Spector, Washington, D.C., for plaintiffs.

Irwin I. Kimmelman, Atty. Gen. of New Jersey by Raymond C. Barzey and Andrea Silkowitz, Deputy Attys. Gen., Trenton, N.J., for defendants Bd. of Public Utilities, Office of Cable Television, State of N.J. and Irwin I. Kimmelman.

Peter J. Pizzi, Kevin J. Coakley, Jacqueline Chasey, Connell, Foley & Geiser, Newark, N.J., for defendant NYT Cable TV.

Francis R. Perkins, Robert St. John Roper, Jeffrey W. Meyers, Cynthia D. Benn, Holzapfel, Perkins & Kelly, New Jersey Partner in the Firm of LeBoeuf, Lamb, Leiby & MacRae, Cranford, N.J., for defendant-intervenor.

## OPINION

BROTMAN, District Judge.

The plaintiffs in this action are a "satellite master antenna" television ("SMATV") company, two real estate developers ("the Developers"), and four condominium homeowners associations ("the Homeowners Associations"). Direct Satellite Communications, Inc. ("DirectSat"), the SMATV firm, has entered into exclusive agreements with the Homeowners Associations to install cable television systems in four planned residential communities ("the Developments") constructed by the Developers in Camden County, New Jersey.

The principal defendant in this litigation is New York Times Cable Television ("NYTCA"), a franchised cable television company which operates primarily in Southern New Jersey. NYTCA has sought and failed to gain entry into the four Developments, and thus has been unable to offer its services to homeowners there. Consequently, NYTCA has filed a series of administrative complaints as well as a civil lawsuit at the state level. In these actions the company challenges the validity of DirectSat's contracts with the Homeowners Associations. NYTCA's actions are based on N.J.S.A. 48:5A–49 ("Section 49"), the "Mandatory Access Law." Section 49 guarantees cable television companies access to multi-unit dwellings and condominium developments in order to solicit customers for their services. Plaintiffs also name as defendants the State of New Jersey, the New Jersey Attorney General, Irwin I. Kimmelman, the New Jersey Board of Public Utilities ("BPU"), and the BPU Office of Cable Television. These defendants are being asked to enforce Section 49 against many of the plaintiffs in the state proceedings initiated by NYTCA.

The Complaint, as amended, asserts that Section 49 is unconstitutional on two separate grounds. First, plaintiffs contend that Section 49 is contrary to the equal protection clause of the Fourteenth Amendment to the United States Constitution. The statute allegedly creates rights of access for franchised cable television companies like NYTCA, while denying the same rights to unfranchised companies such as DirectSat. Second, plaintiffs maintain that Section 49 violates the First, Fifth and Fourteenth Amendments because it forces individuals and communities to allow certain favored cable television companies to gain access to their private property, regardless of whether the owners desire such access, or approve of the message conveyed. Both of plaintiffs' claims are founded on 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 1201 *et seq.* The court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1343.

Presently before the court is plaintiffs' application for a preliminary injunction against enforcement of Section 49 and a declaration that the statute is unconstitutional. In the alternative, plaintiffs request summary judgment on both claims raised in the Complaint, as amended. Fed. R.Civ.P. 56. Defendant NYTCA has filed a cross-motion to dismiss the Complaint, and the State defendants have submitted a

cross-motion for summary judgment. According to NYTCA and the State defendants, plaintiffs lack standing to maintain this action and are unable to substantiate their constitutional claims. In the alternative, the defendants ask the court to dismiss the Complaint, or at least to stay further proceedings, pursuant to the doctrine of abstention. On April 4, 1985, the court granted a motion brought by the New Jersey Cable Television Association ("the Association") to intervene as a party defendant. The Association joins in the cross-motions submitted by the other defendants.

For reasons set forth below, the court will not abstain from exercising its jurisdiction over the issues presented by the parties. The court will grant defendants' motion to dismiss for lack of standing as to plaintiffs' first cause of action. In addition, the court will award defendants summary judgment with respect to plaintiffs' First Amendment claim. Accordingly, plaintiffs' motion for a preliminary injunction or summary judgment will be denied, and the Complaint will be dismissed.

**Factual Background**

The parties acknowledge that they concur as to the facts underlying this case, except for a minor disagreement regarding the degree of similarity between the services offered by DirectSat and NYTCA. Accordingly, there exist no genuine issues of material fact in this case, and the following is undisputed.

**A. The Developments**

This litigation arises out of a battle over rights to provide television service to four newly developed suburban communities in Camden County.[1] Each community has a homeowners association which administers community facilities and collects revenues from each homeowner to finance such activities.

The principal Developer of each of these settlements, John B. Canuso,[2] "considered it vital ... that they have a form of technologically up-to-date cable television service" at the time the new owners moved into the units or as soon as possible thereafter. Affidavit of John B. Canuso ("Canuso Affidavit") at 2–3. Mr. Canuso selected DirectSat because he believed its services to be "at least equal" to those of NYTCA, the franchised purveyor in the area, and because DirectSat could install facilities sooner. Id. at 3. The Homeowners Association for each of the Developments concurred in his judgment and entered into contracts with DirectSat.[3] Id. at 4, 6.

**B. The Providers**

Plaintiff DirectSat and defendant NYTCA both perform a variety of functions and offer numerous different services to customers. DirectSat's operations are typically designed to serve particular multi-unit

---

**1.** Plaintiff Canetic Corporation developed three of the communities: "La Bonne Vie at Echelon," in Voorhees, New Jersey; "La Bonne Vie Condominiums," in Sicklerville, New Jersey; and "The Mews at Chanticleer," one of several distinct condominium developments in a larger development called "Chanticleer," located in Cherry Hill, New Jersey. Plaintiff Chanticleer Venture built the fourth community, another condominium development within Chanticleer in Cherry Hill.

**2.** Mr. Canuso is a principal in Canetic Corp. as well as in both corporations which together constitute the Chanticleer Venture.

**3.** DirectSat reached an agreement with the La Bonne Vie Condominium Association on April 28, 1983, with the La Bonne Vie at Echelon Association on August 19, 1983 and with the

Chanticleer Community Association on May 5, 1984. Canuso Affidavit, Exhibits A, B, C. All three bodies are non-profit corporations; the latter apparently acts for persons in both Chanticleer communities involved in this case.

It is unclear how active these organizations were or how many members they had at the time they reached agreement with DirectSat. Accordingly, it is difficult to tell how much influence persons other than Mr. Canuso had over the decision to arrange for exclusive DirectSat service. Furthermore, Mr. Canuso is President of the Chanticleer Community Association. Canuso Affidavit at 6. Such factual issues bear on the question of whether the inhabitants of the Developments really "chose" DirectSat as their exclusive cable television purveyor. Such questions need not be resolved, however, in order to dispose of the motions now before the court.

dwellings or residential Developments. At or near the service locale, DirectSat installs a receive-only satellite earth station which receives television programming transmitted by satellite. The company also sets up a "master antenna" designed to receive traditional television signals. DirectSat combines the two sets of signals and distributes them via cables connecting its reception facility with customers in the community.

NYTCA serves all of its customers from central reception and transmission facilities. Individual homes and apartments gain access to NYTCA programming through a network of underground coaxial cables buried in public rights-of-way in Southern New Jersey. NYTCA receives television signals transmitted by satellite and traditional means and then relays these broadcasts to persons in a variety of communities willing to pay the company to connect their homes to nearby arteries in the NYTCA cable network.

DirectSat and NYTCA select material for transmission to customers. Both companies provide at least twenty channels of programming including local broadcasts, distant satellite broadcasts and various specialty channels which show movies, sports, news and other material. In addition, customers of DirectSat have access to several non-television "interactive" channels, through which they can arrange for home security services, fire and smoke alarm systems and the like.

### C. The Contracts

The three television service contracts at issue are substantially similar. In numerous respects, they are virtually identical. In each of the communities involved in this litigation, DirectSat has obtained permission to install and maintain a satellite cable television system on community property under the control of the community's Homeowners Association. The agreements also grant to DirectSat "exclusive" rights to use the system to transmit pay television and other services, as well as "to solicit and obtain compensation from the individual residents [of the communities] for the services for which they subscribe." The Homeowners Associations agree to pay DirectSat a monthly service fee equal to the "base service cost times the number of units" using DirectSat services. If any homeowner fails to remit his or her common maintenance charges to the condominium association, the association may request DirectSat to terminate service to that homeowner. DirectSat agrees to provide the four communities with "competitive" service over the life (ten or fifteen years) of the contract. Each of the agreements contains provisions which would allow DirectSat to maintain some degree of responsibility for providing television services for another ten or fifteen years after the expiration of the initial contract term. Canuso Affidavit, Exhibits A, B, C.

### D. The Dispute

Defendant NYTCA has received approval from relevant state and local governments to construct and operate cable television systems in Gloucester, Voorhees and Cherry Hill Townships in Camden County, wherein the four Developments are located.[4] "Commencing in September 1983," NYTCA tried and failed to obtain permission from the Homeowners Associations, the Developers and John B. Canuso himself to enter the Developments to provide cable television service to residents. Pizzi Affidavit, Exhibits A, B, C, D.

In October, 1984, NYTCA filed four administrative complaints with the BPU, Pizzi Affidavit, Exhibits A, B, C, D, and a civil lawsuit with the New Jersey Superior Court, Chancery Division, *NYT Cable TV v. Jocan, Inc., et al.,* Docket No. C–4142–84. The administrative actions, which have

---

4. NYTCA obtained these rights from Audubon Electronics, Inc. ("Audubon"). Audubon received a "municipal consent" to provide cable television service from each of the three townships. The Company then sought and received Certificates of Approval from the BPU sanctioning such service. Subsequently, NYTCA obtained an order from the BPU transferring Audubon's three franchises to NYTCA. Affidavit of Peter J. Pizzi, Esquire, Counsel for defendant NYTCA, Exhibits A, B, C, D.

been referred to the New Jersey Office of Administrative Law, request an order requiring the respondent Developers, Homeowners Associations and John B. Canuso, to permit NYTCA access to various condominium Developments, including the four at issue in this case. NYTCA wishes (1) to install equipment which allows customers to hook into its system, and (2) to solicit subscribers to its services. Pizzi Affidavit, Exhibits A, B, C, D. In its lawsuit in state court, the principal relief requested by NYTCA is an order "declaring void and enforceable as against [NYTCA] the contracts ... between DirectSat and the defendants [including the homeowners association]." *Id.,* Exhibit F at 7.

### E. The Statute

Defendant bases its state court actions and its positions in this litigation on Section 49 of the New Jersey Cable Television Act, N.J.S.A. §§ 48:5A-1, *et seq.* ("the Act"). Section 49[5] prohibits the "owner of any dwelling or his agent" from barring "any tenant of such dwelling from receiving cable television service nor demand or accept payment in any form as a condition of permitting installation of such service." N.J.S.A. 48:5A-49(a). Section 49(b) includes in the definition of "owner" a "condominium association." N.J.S.A. 48:5A-49(b).

**5.** N.J.S.A. 48:5A-49 provides, in pertinent part:
    a. No owner of any dwelling or his agent shall forbid or prevent any tenant of such dwelling from receiving cable television service, nor demand or accept payment in any form as a condition of permitting the installation of such service in the dwelling or portion thereof occupied by such tenant as his place of residence, nor shall discriminate in rental charges or otherwise against any such tenant receiving cable television service; provided, however, that such owner or his agent may require that the installation of cable television facilities conform to all reasonable conditions necessary to protect the safety, functioning, appearance and value of the premises and the convenience, safety and well-being of other tenants; and further provided, that a cable television company installing any such facilities for the benefit of a tenant in any dwelling

### Discussion

The court will first consider defendants' motion to dismiss for lack of standing to sue, as that portion of defendants' pleadings question the very power of the court to hear this matter.

■ Article III of the United States Constitution imposes certain minimum requirements on parties who seek to invoke the federal judicial power. In order to establish the existence of a bona fide "case or controversy," and thus, a basis for subject matter jurisdiction, a plaintiff must have suffered an "injury-in-fact" causally related to a defendant's actions. In other words, a plaintiff must have "personally ... suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant[s]." *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). The Supreme Court has also recognized further limits of a prudential nature, which courts may apply in order to "avoid deciding questions of broad social import where no individual rights would be vindicated." *Id.* at 99–100, 99 S.Ct. at 1607–1608. Although Congress may not tamper with the constitutional minima, the legislature may grant a right to sue to those otherwise barred by prudential restrictions. *Id.* at 99–100, 99 S.Ct. at 1607–1608.

Defendants contend plaintiffs have failed to establish that they have suffered any injury attributable to the actions of NYT-

shall agree to indemnify the owner thereof for any damage caused by the installation, operator or removal of such facilities and for any liability which may arise out of such installation, operation or removal.
    b. For purposes of this section:
    (1) "Owner" includes, but is not limited to, a condominium association and housing cooperative, and "owner of any dwelling or his agent" includes, but is not limited to, a mobile home park owner or operator.
    (2) "Condominium association" means an entity, either incorporated or unincorporated, responsible for the administration of the form of real property which, under a master deed, provides for ownership by one or more owners of individual units together with an undivided interest in common elements appurtenant to each unit.

CA or State officials responsible for cable television regulation. As to plaintiffs' equal protection claim, defendants argue that DirectSat already has access to the four communities embroiled in this dispute. Consequently, defendants maintain that even if Section 49 does "discriminate" against unfranchised cable operators, like DirectSat, and in favor of franchised operators, such as NYTCA, plaintiffs have avoided the unequal impact of the law by making arrangements for DirectSat services prior to the arrival of NYTCA on the scene. *See, e.g.,* Defendant NYTCA's Brief in Opposition to Motion for Summary Judgment or Preliminary Injunction at 5–6. Defendants also charge that Section 49 does not make a distinction between franchised and unfranchised cable television operators, as alleged by plaintiffs. *Id.* Thus, defendants contend, plaintiffs are unable to show they have suffered an "injury ... *as a consequence* of the alleged constitutional error." *Valley Forge College v. Americans United for Separation of Church and State,* 454 U.S. 464, 485, 102 S.Ct. 752, 765, 70 L.Ed.2d 700 (1982) (emphasis in the original).

Defendant-intervenor Association charges that plaintiffs lack standing to litigate their First Amendment claim. According to the Association, defendants' second cause of action is also faulty because it is premised on an erroneous reading of Section 49. As the statute does not discriminate against unfranchised cable companies, plaintiffs are not being forced to permit access to a state-favored speaker, as they allege. In any case, the Association argues, Section 49 does not affect the plaintiff Developers as it only applies to "owners" of multi-unit dwellings and condominium Associations.

In responding to defendants' standing challenge, plaintiffs do not submit evidence indicating that DirectSat has been denied access to any of the Developments based on a restrictive reading of Section 49, with resulting injury to DirectSat and the other plaintiffs.[6] Such a showing is impossible,

as DirectSat is already prepared to provide service in the four Developments. In this case, DirectSat seeks to exclude other cable operators. Nevertheless, plaintiffs argue that they suffer from a threatened injury in that NYTCA's attempt to enforce Section 49 at the state level may "force plaintiff property owners, against their wishes, to admit NYT[CA] and its cables and equipment onto their property, and to abrogate contracts which allow plaintiff DirectSat access to these Developments." Plaintiffs' Reply Brief in Support of Motion for Summary Judgment or Preliminary Injunction at 9–10. Furthermore, "the BPU proceedings initiated by NYT[CA] would, if successful, injure DirectSat in its competition with NYT[CA] and other franchised systems." *Id.* at 10. Finally, plaintiffs contend that the State's favoritism toward franchised operators harms DirectSat "in terms of its ability to demonstrate cable speech protected by the First Amendment." *Id.*

■ Plaintiffs' contentions are sufficient to state a threatened injury to rights they claim under the First Amendment. Defendants' actions portend the entry of NYTCA's equipment and services onto property owned, managed or serviced by the various plaintiffs. DirectSat and the Homeowners Associations, as parties to exclusive service contracts, would plainly be harmed by access for NYTCA, in contravention to such agreements. The existence of a single, unobtrusive, unoffensive cable television service allegedly increases the attractiveness of units in the four Developments to potential customers. Canuso Affidavit at 4. Thus, the record indicates that both Developers are threatened with injury if NYTCA gains access to the Developments. Consequently, plaintiffs are entitled to present legal argument to the effect that enforcement of Section 49 so as to permit access for NYTCA would infringe plaintiffs' right to exclude undesired state-

---

**6.** In fact, plaintiffs fail to offer proof of any instance in which DirectSat has sought to invoke the benefits of Section 49 without success, or in which DirectSat has been refused access to customers due to discriminatory application of Section 49.

sponsored "speakers" from private property.

On the other hand, plaintiffs fail to allege a colorable injury related to the State's alleged denial of "equal protection of the laws." The court acknowledges that if NYTCA is permitted access to the four Developments, DirectSat's prospects of profitable operations there will be dimmer. The court also recognizes that opening the Developments to a spectrum of cable operators would deprive the other plaintiffs of their control over the nature of cable television service in the communities. All the same, such injuries have nothing to do with discrimination against unfranchised cable operators. Section 49 threatens to subject DirectSat to competition from franchised operators regardless of whether the statute does or does not apply to unfranchised companies.

■ The Equal Protection Clause guarantees a remedy to redress certain inequities in the distribution of legal benefits by state governments. Where, as here, the inequity consists of an alleged denial of rights of access, a party has no standing to sue, and suffers to unequal treatment, if access already exists. In order to raise an equal protection claim, DirectSat must wait until another day, when it is faced with an exclusive arrangement like the one from which it now seeks to benefit.[7] Certainly, plaintiffs will benefit from an order enjoining application of Section 49 in favor of NYTCA on the grounds that the statute violates the Equal Protection Clause. Such relief, however, would redress no injury to plaintiffs attributable to the denial to DirectSat of the rights guaranteed by Section 49.

In light of the foregoing, the court need not address the question of whether Section 49 applies only to franchised cable operators. Defendants' motion to dismiss on the grounds that plaintiffs lack standing to sue will be granted as to Count 1 of the Complaint. The motion will be denied as to plaintiffs' First Amendment claims.

The court now turns to defendants' motion to dismiss for failure to state a claim, and in the alternative, for abstention. Before reviewing the adequacy of plaintiffs' First Amendment claims, the court will address the proposed grounds for abstention.

■ There is no basis for a decision to dismiss this action in order to avoid interference with ongoing state proceedings pursuant to *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and its progeny. In this Circuit, application of the *Younger* doctrine in civil cases has been limited to instances in which a state or an agency of the state has begun enforcement proceedings in a state tribunal, judicial or administrative. Where, as here, each of "the pending state proceeding[s] is a privately-initiated one, the state's interest in the proceeding is not strong enough to merit *Younger* abstention." *Harris v. Pernsley*, 755 F.2d 338, 344 (3rd Cir.1985), *quoting Williams v. Red Bank Board of Education*, 662 F.2d 1008, 1019 (3rd Cir. 1981). *Accord Johnson v. Kelly*, 583 F.2d 1242, 1249 (3rd Cir.1978); *Bally Manufacturing Corp. v. Casino Control Commission*, 534 F.Supp. 1213, 1218–19 (D.N.J. 1982).

Defendants also ask the court to consider deferring to pending litigation related to this case at the state level in accordance with *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) and *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The court will decline the invitation in both respects.

It would be inappropriate for the court to avoid exercising its jurisdiction in this case based on *Burford v. Sun Oil Co., supra,* as that case involved much different circumstances. In *Burford,* the Court considered a due process challenge to state

---

7. As for the other plaintiffs, it is hard to imagine an instance in which they would have an interest in raising an equal protection challenge to Section 49 on the grounds that it allows them to exclude an unfranchised cable operator. Of course, individual homeowners seeking access to excluded, unfranchised cable services might wish to join a lawsuit premised on an equal protection theory brought by an excluded, unfranchised operator.

administrative orders. For fear of disrupting a complex regime of economic regulation, the Court declined to intervene. Plaintiffs' claims pose no such difficulty. In the first place, this action presents a straight-forward challenge to the constitutionality of a state statute. Furthermore, no indepth knowledge of the industry subject to state regulation is required to dispose of this action.

Abstention may be appropriate under *Railroad Commission of Texas v. Pullman, supra,* when a federal court is asked to address uncertain issues of state law in order to resolve a constitutional challenge to a state statute. The decision to abstain is within the sound discretion of the trial court. *D'Iorio v. County of Delaware,* 592 F.2d 681, 686 (3rd Cir.1978); *Frederick L. v. Thomas,* 557 F.2d 373, 382 (3rd Cir.1977). Furthermore, abstention is an expedient to be employed only in extraordinary circumstances. *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). The legal issues raised by plaintiffs' First Amendment claims are not so complex or unusual as to justify abstention. Accordingly, the court will now proceed to consider defendants' motions directed at the legal sufficiency of such claims.

Defendant NYTCA originally filed a cross-motion to dismiss the Complaint for failure to state a valid cause of action. Fed.R.Civ.P. 12(b)(6). The State defendants subsequently filed a cross-motion for summary judgment. Fed.R.Civ.P. 56. As the court has received and considered numerous submissions from the parties which allege facts not contained in the pleadings, pursuant to Fed.R.Civ.P. 12(b), the court will treat the defendants' cross-motions as a single request for summary judgment.

The standard for granting summary judgment is a stringent one. Rule 56(c), Fed.R.Civ.P., provides that summary judgment may be granted only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Special Jet Servic-*

*es, Inc. v. Federal Insurance Co.,* 643 F.2d 977 (3rd Cir.1981); *Ely v. Hall's Motor Transit Co.,* 590 F.2d 62 (3rd Cir.1978). In deciding whether an issue of material fact does exist, the court is obligated to view all doubt in favor of the nonmoving party. *Tomalewski v. State Farm Insurance Co.,* 494 F.2d 882 (3rd Cir.1974); *Smith v. Pittsburgh Gage and Supply Co.,* 464 F.2d 870, 874 (3rd Cir.1972).

It is undisputed that in this case, there exist no significant outstanding issues of material fact. Accordingly, this matter is ripe for summary judgment.

In the second count of the Complaint, plaintiffs allege that Section 49 of the New Jersey Cable Television Act constitutes state action forcing private property owners to admit third-party speakers onto their property, in violation of the First, Fifth and Fourteenth Amendments. Plaintiffs' argument draws inspiration from two Supreme Court cases involving state regulation of speech on private property. *Pruneyard Shopping Center v. Robins ("Pruneyard"),* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977).

In *Pruneyard,* the Court upheld a California Supreme Court decision which declared that individuals have a right under the California Constitution to engage in speech-related activities in a privately owned shopping center. The Court had previously ruled that the First Amendment to the United States Constitution does not guarantee such access. *See Lloyd Corp. v. Tanner,* 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972). Based on a finding that a "State in the exercise of its police power may adopt reasonable restrictions on private property," the *Pruneyard* Court rejected the mall owner's claims that the State's guarantee of access to his facility (for students wishing to solicit signatures for political petitions) constituted a deprivation of property without due process. 447 U.S. at 81, 100 S.Ct. at 2040. The question at issue in *Wooley v. Maynard, supra,* was the validity of a New Hampshire law which

made it a criminal offense for automobile owners to obscure the portion of their vehicle license plates bearing the State's motto: "Live Free or Die." The Court invalidated the state rule as contrary to the First Amendment in an action filed by Jehovah's Witnesses who considered the motto repugnant to their personal beliefs. 430 U.S. 714–17, 97 S.Ct. at 1435–37.

Plaintiffs ask the court to focus on passages in *Pruneyard* in which the Court discussed First Amendment limits on rights of access to private property to engage in speech-related activities. In particular, plaintiffs rely on the concurring opinion of Justice Powell, who declared that

> Even when no particular message is mandated by the State, First Amendment interests are affected by State action that forces a property owner to admit thirty-party speakers. In many situations, a right of access is no less intrusive than speech compelled by the State itself....
>
> A property owner ... may be faced with speakers who wish to use his premises as a platform for views that he finds morally repugnant.

447 U.S. at 98–100, 100 S.Ct. at 2049–51. Plaintiffs object to three aspects of New Jersey's decision to mandate access to condominium developments for cable television operators. First, plaintiffs argue that inhabitants of the four Developments may be subjected to forced exposure to third-party messages they abhor. Plaintiffs seem to compare the situation in this case to circumstances in which a state tells "a man, sitting alone, in his own house, what books he may read and what films he may watch." Plaintiffs' Brief in Support of Motion for Summary Judgment or Preliminary Injunction at 21, n. 9, *quoting Pruneyard, supra*, 447 U.S. at 100, n. 4, 100 S.Ct. at 2050, n. 4. Second, plaintiffs assert that the Mandatory Access Law constitutes "state action that transforms privately

owned property into a forum for the expression of the public's views." *Id.* at 21, *quoting Pruneyard, supra*, 447 U.S. at 97, 100 S.Ct. at 2049.[8] Finally, plaintiffs contend that the discriminatory nature of Section 49 renders its intrusive effect all the more offensive.

Plaintiffs go so far as to acknowledge that *Pruneyard* expressly rejected a broad "First Amendment right not to be forced by the State to use [one's private] property as a forum for the speech of others." 447 U.S. at 85, 100 S.Ct. at 2043. Nevertheless, plaintiffs argue that three factors which caused the Court to sustain forced access to private property in *Pruneyard* do not exist here: that private property was akin to a public space; that no specific message was dictated by the State; and that the property owner could easily disavow any connection with the message. 447 U.S. at 87, 100 S.Ct. at 2044. Accordingly, plaintiffs maintain that this case is analogous to *Wooley v. Maynard, supra*, and likewise merits a ruling in favor of private property owners.

Each of plaintiffs' arguments fall apart upon examination of the undisputed facts alleged by the parties. If NYTCA obtains access to the four Developments, individual homeowners therein will have the opportunity to choose to receive programming broadcast by NYTCA. Those homeowners who do not desire NYTCA service may refuse to pay for it. The latter group will only learn of the content of the programs transmitted by NYTCA if they discuss them with their neighbors receiving such service. Because the messages aired by NYTCA are only directed into the homes of persons who choose to receive such information, there is no danger of forced exposure to NYTCA broadcasts. For the same reasons, Section 49 does not threaten infringement of "the right to control one's

---

**8.** In this regard, plaintiffs cite Justice Powell's warning that

> [t]o require the [property] owner to specify the particular ideas he finds objectionable enough to compel a response would force him to ·relinquish his 'freedom to maintain his

own beliefs without public disclosure.' Thus the right to control one's speech may be burdened impermissibly even when listeners will not assume that the messages expressed on private property are those of the owner.
447 U.S. at 100, 100 S.Ct. at 2050.

speech" or "freedom to maintain [one's] own beliefs without public disclosure."

■ The factors which formed the basis for the *Pruneyard* decision do not dictate a different result in this case. First, there is no need for the plaintiff Homeowners Associations or Developers to disavow a connection with speech broadcast by NYTCA. There is no reason to believe that anyone will assume the plaintiffs endorse messages transmitted into an individual's home at the individual's own request. Plaintiffs have certainly presented no credible evidence indicating otherwise. Second, the Mandatory Access Law does not dictate the entry onto plaintiffs' property of any particular message. Even if Section 49 discriminates against unfranchised cable operators, it does so without regard to the content of the speech conveyed by such companies. Furthermore, Section 49's discriminatory nature, if any, does not change the fact that mandatory access causes no reduction in a homeowner's ability to regulate the entry of speech into his or her home.

NYTCA's attempt to provide service to the inhabitants of the four Developments, pursuant to the Mandatory Access Law, does not threaten any damage to plaintiffs' First Amendment interests. Any loss of control over speech-related activities in the Developments will be incurred only by the entrepreneurs seeking to sell homes therein or by organizations representing individual homeowners in the aggregate. Such effects will not be experienced by individual homeowners, and in this action, the First Amendment interests identified by plaintiffs are of the kind which attach to individuals.

The individual homeowners in the four Developments will be protected by some of the charming features of cable television: it is possible to pick and choose program packages one wishes to enjoy; and these programs are delivered directly into the privacy of individual homes. In order to avoid exposure to particular programs, one need only decline to pay for the services of the operator who provides them. In light of the foregoing, the court will grant summary judgment in favor of defendants as to count two of the Complaint.

**Conclusion**

Defendants' motion to dismiss the Complaint, as amended, for failure of the plaintiffs to establish standing to sue, is granted as to the first count of the Complaint and denied as to the second count of the Complaint. Defendants' motion to dismiss, or in the alternative, for a stay of proceedings on grounds of abstention is denied. Defendants' motion for summary judgment is granted as to the second count of the Complaint, as amended. In light of the foregoing dispositions, the court will deny plaintiffs' motion for summary judgment or, in the alternative, for a preliminary injunction. Accordingly, the complaint is dismissed. An appropriate order will be entered.