GREATER WORCESTER
CABLEVISION, INC.,
Plaintiff,

v.

CARABETTA ENTERPRISES, INC., Joseph F. Carabetta, and Lincoln Street Realty Company, Defendants.

Civ. A. No. 85–2022–MA.

United States District Court,
D. Massachusetts.

Nov. 20, 1985.

Michael P. Angelini, Barry A. Bachrach, Bowditch & Dewey, Worcester, Mass., for plaintiff.

Joanne E. Romanow, Schlesinger and Buchbinder, Newton, Mass., Christine S. Vertefeuille, Andrew R. Lubin, Susman & Duffy, P.C., New Haven, Conn., for defendants.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

This is an action for an injunction enforcing rights under Massachusetts' community antenna television system statute, Mass. Gen.Laws Ann. ch. 166A, § 22 (West 1976 & Supp.1985), and under section 621(a)(2) of the Federal Cable Communications Policy Act of 1984, 47 U.S.C.A. § 541(a)(2) (West Supp.1985). Plaintiff Greater Worcester Cablevision, Inc. (Cablevision) holds a non-exclusive license from the City of Worcester to provide cable television service to Worcester residents.[1] Defendant Lincoln Street Realty Company (Lincoln), is a limited partnership which owns Lincoln Village Apartments, a 1200–unit apartment complex in Worcester. Defendants Carabetta Enterprises, Inc. and Jo-

1. The City of Worcester originally granted a license to install and operate a community antenna television system on January 7, 1972 to Parker Industries d/b/a Parker Cablevision. This license was later assigned to Greater Worcester Cablevision, Inc.

seph F. Carabetta are Lincoln's general partners.

## I.

In March 1985, Cablevision sought access to Lincoln's property in order to install cable television, at the request of several Lincoln tenants.[2] Lincoln refused access. Lincoln has recently permitted American Satellite Cable Corporation, a Cablevision competitor, to install a satellite master antenna television system which will offer the same television services to Lincoln tenants as Cablevision seeks to provide. Affidavit of Salvatore Carabetta; Affidavit of Carole T. Kissel.

Cablevision originally sought a preliminary injunction, as well as a permanent injunction, ordering Lincoln to permit Cablevision access to install its cable equipment. Cablevision contends that under the terms of its license, it is duty bound to provide cable television service to every Worcester resident who requests such service. Further, Cablevision argues that section 22 obliges owners of multi-dwelling property such as Lincoln to afford it access so that it can do so. Under the Massachusetts statute, a property owner is deemed to have consented to access once the cable operator furnishes him with a copy of the statute and a statement agreeing to be bound by its terms; Cablevision did so. Cablevision also contends that the newly-enacted federal Cable Communications Pol-

icy Act of 1984 creates a similar right of access for licensed cable operators by its provision that cable operators can use easements a property owner has already granted to public utilities.

Cablevision filed its complaint in state court in April, 1985. Lincoln removed the case to this Court in May, 1985. This Court's subject matter jurisdiction is based on diversity of citizenship. Cablevision is a Massachusetts corporation with its principal place of business in Worcester. Carabetta Enterprises, Inc. is a Connecticut corporation with its principal place of business in Meriden, Connecticut. Joseph Carabetta is a Connecticut citizen. Lincoln, the limited partnership, has 119 limited partners, none of whom are Massachusetts citizens.

After a hearing in Worcester on August 20, 1985, this Court denied Cablevision's preliminary injunction motion, concluding in part that damages were calculable and available. This matter is now before the Court on Lincoln's motion to dismiss for failure to state a claim on which relief can be granted.

## II.

Lincoln does not dispute that the Massachusetts statute, Mass.Gen.Laws Ann. ch. 166A, § 22 (West 1976 & Supp.1985), gives Cablevision an enforceable right of access to Lincoln's apartment complex.[3] Lincoln

---

**2.** On March 21, 1985, Cablevision sent by certified mail a letter to a Worcester attorney, Joseph Cariglia, Lincoln Street Realty Company's lawful agent, requesting access to Lincoln Village in order to install community antenna television equipment, enclosing a copy of the Massachusetts statute, and promising to be bound by its terms. This letter was delivered on March 22, 1985. On the same day, Cablevision sent the same letter by certified mail to Lincoln Street Realty Company at its office in Meriden, Connecticut. This letter was delivered on March 25, 1985.

**3.** Mass.Gen.Laws Ann. ch. 166A, § 22 (West 1976 & Supp.1985) provides that:

No operator shall enter into any agreement with persons owning, leasing, controlling or managing buildings served by a CATV system, or perform any act, that would directly or indirectly diminish or interfere with existing rights of any tenant or other occupant of such a build-

ing to use of master or individual antenna equipment.

An operator who affixes, or causes to be affixed, CATV system facilities to the dwelling of a tenant shall do so at no cost to the landlord of such dwelling, shall indemnify the landlord of such dwelling for any damage arising out of such actions, and shall not interfere with the safety, functioning, appearance or use of such dwelling.

The consent required by section thirty-five of chapter one hundred and sixty-six shall be deemed to have been granted to an operator upon his delivery to the owner or lawful agent of the owner of property upon which he proposes to affix CATV system facilities of a copy of this section, and a signed statement that he agrees to be bound by the terms of this section.

An owner of property, or his lawful agent, may sue in contract to enforce the provisions of an operator's agreement under this section.

also concedes that Cablevision has followed the statutory procedure which required Cablevision to deliver to Lincoln a copy of the statute and a signed statement agreeing to be bound by its terms.[4] Lincoln, however, attacks the statute's constitutionality.

Lincoln alleges three constitutional defects: (1) the statute authorizes a taking of private property without just compensation, in violation of the Fifth and Fourteenth Amendments; (2) the statute violates Lincoln's First Amendment free speech rights by requiring Lincoln to permit Cablevision, a state-licensed speaker, to use its property as a platform; and (3) the statute gives mandatory access only to licensed community antenna television (CATV) operators, discriminating against competing television providers in violation of the Equal Protection Clause of the Fourteenth Amendment.

Lincoln also contends that section 621(a)(2) of the newly-enacted Cable Communications Policy Act, on which Cablevision relies in seeking an order permitting it to use utility easements and public rights-of-way at Lincoln Village, is unconstitutional and, in any event, will not have the broad practical effect that Cablevision claims. These contentions are addressed *seriatim.*

## A. THE MASSACHUSETTS CATV STATUTE

### 1. UNCOMPENSATED TAKING

Section 22 of the Massachusetts CATV statute, Mass.Gen.Laws Ann. ch. 166A, § 22 (West 1976 & Supp.1985), provides that a landlord must permit a cable operator to install its cable television equipment on his property if a tenant has asked for cable service. Installation of Cablevision's facilities will require physical attachment of conduit or wire molding to the buildings and the installation of some 25,000 feet of cable wire. Affidavit of Salvatore Carabetta. This, Lincoln asserts, will be a permanent physical occupation of its property, and thus a taking for which compensation is due under the Fifth and Fourteenth Amendments. Lincoln contends that section 22 must be struck down because it nowhere provides for such compensation. Moreover, the statute explicitly prohibits a property owner from "demand[ing] or accept[ing] payment, in any form, for the affixing of CATV system equipment...." Lincoln also argues that section 22 does not provide any mechanism by which it can seek just compensation. When the Massachusetts Legislature has intended to compensate property owners for takings, it has fashioned elaborate procedures. Its failure to do so when it enacted section 22, Lincoln asserts, means the Legislature did not intend for landlords to receive compensation for the installation of cable on their property.

Cablevision agrees that installation of its cable facilities will work a taking of Lincoln's property. But it insists that section 22 obliges cable operators to compensate property owners for any taking that results. Cablevision urges a broad reading of its duty under section 22 to indemnify Lincoln for "any damage" caused when it affixes its cable equipment. "Any dam-

---

No person owning, leasing, controlling or managing buildings served by a CATV system shall discriminate in rental or other charges between tenants who subscribe to such CATV services, and those who do not or demand or accept payment, in any form, for the affixing of CATV system equipment to such buildings, except that to which he is entitled under the provisions of this section.

4. Mass.Gen.Laws Ann. ch. 166, § 35 (West 1976) provides that:

A corporation or person maintaining or operating telephone, telegraph, television or other electric wires or any other person who in any manner affixes or causes to be affixed to the property of another any pole, structure, fixture, wire or other apparatus for telephonic, telegraphic, television or other electrical communication, or who enters upon the property of another for the purpose of affixing the same, without first obtaining the consent of the owner or lawful agent of the owner of such property, shall, on complaint of such owner or his tenant, be punished by a fine of not more than one hundred dollars.

Chapter 166A, § 22 provides that the owner's consent is "deemed to have been granted" when a cable operator delivers to the "owner of property upon which he proposes to affix CATV system facilities ... a copy of [§ 22], and a signed statement that he agrees to be bound by the terms of [§ 22]."

age," Cablevision contends, should be construed as damage caused by the permanent physical occupation of Lincoln's real property, as well as actual physical damage to Lincoln's buildings, fixtures or land. Section 22 does not prohibit such payments Cablevision argues; only payments in excess of payments for damage caused by installation of cable facilities are prohibited. Finally, Cablevision contends that section 22 does provide a mechanism by which Lincoln can obtain compensation. Cablevision must agree to be contractually bound by its obligations under section 22. Lincoln's remedy for just compensation is a contract action that will determine how much Cablevision must pay for any actual damage it causes, as well as for the property it takes.

Unquestionably, section 22 authorizes a taking of property compensable under the Fifth and Fourteenth Amendments by obliging landlords to permit cable operators to install cable equipment on their property. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). The Supreme Court in *Loretto* defined a taking as any "permanent physical occupation" of property by a third party. *Id.* at 426, 102 S.Ct. at 3171. *Loretto* involved a New York statute providing that a landlord must permit a cable operator to install cable facilities on the landlord's property and may not demand payment from the operator in excess of the amount determined by a state commission to be reasonable. The Court ruled that installation—the "direct physical attachment of plates, boxes, wires, bolts and screws to the building," *id.* at 438, 102 S.Ct. at 3177—was a permanent physical occupation of the building that destroyed the building owner's rights to possess, use and dispose of her property. *Id.* at 435–37, 102 S.Ct. at 3175–77.

The *Loretto* court did not strike down the New York statute, but remanded to the state courts to determine the amount of compensation due. Cable operators, under the New York statute, cannot be forced to pay a landlord "in excess of any amount which the [State Commission on Cable Television] shall, by regulation, determine rea-

sonable." *Id.* at 423 n. 3, 102 S.Ct. at 3169 n. 3. The state commission has ruled that a one-time $1 payment is the normal fee to which a landlord is entitled for the installation of cable equipment, though the commission's regulations permit higher than nominal awards if a landlord makes a special showing of greater damages. *Id.* at 424–25, 456 n. 12, 102 S.Ct. at 3169–70, 3176 n. 12.

Lincoln contends that the absence of language like that of the New York statute, providing for nominal compensation determined by a state agency with the possibility for higher awards, renders the Massachusetts statute constitutionally invalid. Lincoln relies on two Florida cases striking down a statute which required that landlords allow franchised cable operators access to apartment buildings but held the cable operator "responsible for paying to the landlord any costs, expenses or property damage that are incurred by the landlord during installation, repair, or removal of the cable," holding that this amounted to a taking that did not require payment of just compensation. *Beattie v. Shelter Properties IV*, 457 So.2d 1110 (Fla. Dist. Ct. App.1984); *Storer Cable T.V. v. Summerwinds Apartments*, 451 So.2d 1034 (Fla. Dist. Ct. App.1984).

The *Beattie* court refused to construe the statute's requirement that cable operators pay for property damage as a provision for payment of just compensation "in view of the strong, direct prohibition" elsewhere in the statute that no cable operator would be forced to "pay anything of value in order to obtain or provide" cable television service. Fla. Stat. Ann. § 83.66(1) (West Supp.1984). Lincoln argues that this language in the Florida statute is no different from language in the Massachusetts statute prohibiting property owners from demanding or accepting payment in any form for the installation of cable television equipment on their property, and concludes that the requirement that cable operators indemnify property owners for damages caused by the installation of cable facilities cannot be read as requiring compensation.

Cablevision concedes that *Loretto* is controlling and that section 22 authorizes takings of private property by cable operators. Cablevision insists, however, that the statute can be read to require payment of just compensation. Cablevision relies on *Princeton Cablevision, Inc. v. Union Valley Corp.*, 195 N.J.Super. 257, 478 A.2d 1234 (N.J.Ch.1983) which upheld a New Jersey statute giving cable operators a right of access to private property over objections that the statute authorized a taking without just compensation. The challenged statute prohibits an "owner from demanding or accepting payment in any form as a condition of permitting installation of cable service" *Princeton Cablevision*, 195 N.J.Super. at 262, 478 A.2d at 1240, but also requires the cable operator to indemnify the property owner for "any damage caused by the installation, operation or removal" of cable facilities. The court ruled that the prohibition on payments meant only that a landlord could not force his tenants to pay him in exchange for allowing cable facilities to be installed, holding that the later language meant cable television operators were obliged to pay landlords just compensation for property taken when cable facilities were installed. Cablevision urges a similar reading of section 22.

The issue before this Court is whether section 22 can be read to include an obligation on the part of Cablevision to pay just compensation for the taking of Lincoln's property involved in installing Cablevision's cable television equipment. If not, section 22 is constitutionally invalid because it authorizes a taking of private property without just compensation. Although the mandatory access provisions of section 22 were added by amendment. in 1977, no Massachusetts court has had the opportunity to consider these statutory provisions. At this point, I digress briefly to consider the issues of abstention and certification in view of the absence of Massachusetts law.

■ This case presents a novel question of Massachusetts statutory law which, if answered as Cablevision urges, avoids the necessity for federal constitutional adjudication. If section 22 does provide for just compensation when cable operators take private property by installing cable equipment, then the federal constitutional issue is avoided. Abstention in this situation is not unthinkable. *See, e.g., Bellotti v. Baird*, 428 U.S. 132, 146–47, 96 S.Ct. 2857, 2865–66, 49 L.Ed.2d 844 (1976); *Harrison v. NAACP*, 360 U.S. 167, 177, 79 S.Ct. 1025, 1030, 3 L.Ed.2d 1152 (1959). But abstention from "the exercise of federal jurisdiction is the exception, not the rule." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). An exception to this principle has been recognized where a challenged state statute is "fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question." *Harman v. Forssenius*, 380 U.S. 528, 535, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965). But the challenged statute must be ambiguous and uncertain, as well as unconstrued by the state courts. It is not enough that state courts have yet to consider the statute. There must be more than a "bare, though unlikely, possibility that state courts might render adjudication of the federal question unnecessary." *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984). While the construction of section 22 urged by Cablevision is not outlandish, I cannot agree that section 22 is "fairly subject" to Cablevision's interpretation, and this Court will not, therefore subject the parties to "the delay and expense to which application of the abstention doctrine inevitably gives rise." *Bellotti*, 428 U.S. at 150, 96 S.Ct. at 2686 (quoting *Lake Carriers Assn. v. MacMullan*, 406 U.S. 498, 509, 92 S.Ct. 1749, 1757, 32 L.Ed.2d 257 (1972)).

■ I am aware that unsettled questions of Massachusetts state law may be certified from the federal courts directly to the Supreme Judicial Court. Mass. Rules of Court, Sup.Jud.Ct.Rule 1:03. (West 1985). Certification has been endorsed since its use can "save time, energy, and resources and helps build a cooperative judicial federalism." *Lehman Brothers v. Schein*, 416

U.S. 386, 390–91, 94 S.Ct. 1741, 1744, 40 L.Ed.2d 215 (1974); *see also Bellotti v. Baird,* 428 U.S. at 146–47, 96 S.Ct. at 2866–67. Nonetheless, I am persuaded that this case is not an appropriate one for certification.

First, the availability of certification, by itself, cannot justify abstention where abstention is not otherwise appropriate. Certification makes more palatable a federal court's inclination to abstain by reducing the delay and expense to the parties that abstention usually entails. *See Lake Carriers Assn. v. MacMullan,* 406 U.S. 498, 509, 92 S.Ct. 1749, 1756, 32 L.Ed.2d 257 (1972). Here, however, this Court has already decided that abstention is inappropriate because section 22 is not susceptible to a construction that avoids the federal constitutional questions. My abstention decision turned on the legal issue involved—the statutory language—and not on the equitable considerations of delay and expense. Thus, the availability of Massachusetts' certification procedure does nothing to change that analysis. Second, neither of the parties has asked me to certify this or any other question to the Supreme Judicial Court. I could, of course, send this question or questions to the Supreme Judicial Court on my own. Given this Court's determination that section 22 is not fairly susceptible to the reading urged by Cablevision, however, I think that the delay and expense that would be imposed on the parties if I certified this question or questions would be unwarranted. Before I certified a question or questions to the Supreme Judicial Court, I would feel compelled to ask the parties to consider and argue the matter. Then, of course, the Supreme Judicial Court would have to consider the matter and could very well request the parties to amplify the record on this point. Even the expedited certification process would mean further delay and cost to the parties. Finally, the procedural posture of the case also leads me to conclude that certification is inappropriate. This case originated in state court. On the ground of diversity of citizenship, Lincoln successfully petitioned for removal to this Court. 28 U.S.C. § 1441. Lincoln's choice

of forum is deserving of some respect. For whatever reason, Lincoln chose to defend itself in a federal, and not a state, court. It would be unfair to Lincoln, and contrary to the policy underlying removal and diversity jurisdiction, *see Brown v. Flowers Industries, Inc.,* 688 F.2d 328, 330 n. 1 (5th Cir.1982), *cert. denied,* 460 U.S. 1023, 103 S.Ct. 1275, 75 L.Ed.2d 496 (1983), for this Court to send the parties back to state court to litigate what has emerged as a key issue in their dispute. Having considered these issues, then, and declining to employ those processes, I turn back to the issue at hand.

■ I am mindful of the principle of statutory construction urging me to construe section 22 consistently with constitutional requirements if possible. *Selective Service System v. Minnesota Public Interest Research Group,* 468 U.S. 841, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984). Legislatures are presumed knowledgeable of constitutional requirements and it is also presumed that they intend to be guided by them. Still, this Court must conclude that section 22 cannot fairly be read to require cable operators to compensate property owners for the taking of property it authorizes.

The starting point in deciding whether section 22 provides for adequate compensation is the statutory language itself. *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982); *Lane v. United States,* 727 F.2d 18, 20 (1st Cir.1984). Section 22 provides that "[n]o person owning, leasing, controlling or managing buildings served by a CATV system shall ... demand or accept payment, in any form, for the affixing of CATV system equipment to such buildings, except that to which he is entitled under the provisions of this section." I do not agree with Lincoln that this provision, by itself, bars cable operators from paying compensation for property taken when they install cable television equipment pursuant to section 22. Arguably it applies only to additional payments from tenants, and not to payments from cable operators. The immediately preceding por-

tion of the sentence quoted above prohibits landlords from charging tenants who subscribe to cable service higher rent "or other charges." *See Princeton Cablevision,* 195 N.J.Super. at 270, 478 A.2d at 1247. *But see Beattie,* 457 So.2d at 1113. Even if it does refer to payments from cable operators to landlords, this provision is not an absolute bar to such payments; it still allows landlords to receive those payments "to which he is entitled" by other provisions of section 22. If Cablevision were correct that other provisions of section 22 oblige cable operators to pay just compensation, this language would not nullify such payments. Such a reading would make this final clause surplusage.

■ The provision that cable operators must "indemnify the landlord" of a building in which the cable operator wants to install cable equipment "for any damage arising out of such actions" does not, however, satisfy the constitutional requirement for compensation. While it is true that in takings cases, Massachusetts courts have used "compensation" and "damages" interchangeably, *see, e.g., Verrochi v. Commonwealth,* 394 Mass. 633, 477 N.E.2d 366 (1985); *Opinion of the Justices,* 365 Mass. 681, 692, 313 N.E.2d 561 (1974), it is notable that nowhere does section 22 refer to installation of cable equipment as a taking. Though this choice of language is not, by itself, conclusive, it strongly suggests that the Legislature did not believe it was authorizing cable operators to exercise the power of eminent domain when it enacted section 22.

There is a marked contrast between section 22 with its ambiguous choice of the word "damage" and its private contract action to enforce a cable operator's promises, and other Massachusetts statutes governing similar situations involving public utilities.

Massachusetts' obligation to compensate property owners for land seized through its power of eminent domain is constitutionally compelled by art. 10 of the Massachusetts Declaration of Rights. *See Bromfield v. Treasurer & Receiver–General,* 390 Mass. 665, 668, 459 N.E.2d 445 (1983). For that

reason when the Commonwealth exercises its right of eminent domain—as it did when the Legislature enacted section 22 and authorized franchised cable operators to take land—"[t]he act granting the power must provide for compensation, and a ready means of ascertaining the amount." *Id.* (*quoting Haverhill Bridge Proprietors v. County Comm'rs of Essex,* 103 Mass. 120, 124–25 (1869)). Other similar delegations of eminent domain power typically follow the statutory procedure enacted in Mass. Gen.Laws Ann. ch. 79, which "embodies rights guaranteed under art. 10 of the Declaration of Rights," *Bromfield,* 390 Mass. at 671 n. 11, 459 N.E.2d 445, and provides a procedure for petitioning for assessment of damages. Gas and electric utilities, for example, are authorized to take private property, Mass.Gen.Laws Ann. ch. 164 §§ 69R and 72, but compensation is determined by the procedure established in chapter 79. Telephone and telegraph companies are authorized to use public ways and to build transmission lines, including poles, conduits and wires, Mass.Gen.Laws Ann. ch. 166, § 21, but adjoining landowners along a public way are expressly entitled to pursue damages for any taking that occurs, Mass.Gen.Laws Ann. ch. 166, § 29. Cablevision's argument that the Legislature recognized that section 22 authorized takings of private property—i.e., exercises of eminent domain—but chose to leave property owners to a contract action rather than the chapter 79 petition process is implausible.

Cablevision is correct that courts are capable of determining what compensation is due. *See Correia v. New Bedford Redevelopment Authority,* 375 Mass. 360, 361–62, 377 N.E.2d 909 (1978). The question, however, is not whether the contract action created by section 22 is procedurally adequate as a means of determining just compensation. Rather, the question is did the Legislature, when it enacted section 22, recognize that it was authorizing cable operators to take private property or not. The Legislature's neglect of the readily available chapter 79 eminent domain proce-

dure, while not necessarily conclusive, is strongly indicative that it did not.[5]

*Loretto* is of no help to Cablevision. The statute upheld by implication in *Loretto*, New York Exec. Law § 828 (McKinney Supp.1981–1982), provides that cable operators will "agree to indemnify the landlord for any damage caused by the installation, operation or removal of [cable] facilities." § 828(1)(a)(iii). It separately provides that no landlord shall demand payment from any cable operator for permitting installation of cable equipment "in excess of any amount which the [State Commission on Cable Television] shall, by regulation, determine reasonable." § 828(1)(b). The Commission ruled later that a nominal $1 fee would be sufficient to satisfy constitutional requirements "in the absence of a special showing of greater damages attributable to the taking." *Loretto*, 458 U.S. at 424, 102 S.Ct. at 3170. Landlords are compensated pursuant to the language in section 828(1)(b) directing the state commission to determine just compensation for takings of property authorized by section 828, not pursuant to the "any damage" language in section 828(1)(a)(iii).

Cablevision also relies on *Board of Health of Franklin v. Hass*, 342 Mass. 421, 173 N.E.2d 808 (1961), arguing that Massachusetts courts have read the word "damage" broadly in order to satisfy constitutional requirements. There the court upheld a statute permitting a board of health

to regulate and prohibit piggeries, holding that statute adequately compensated the owner of a piggery forced to shut down who succeeded in persuading a reviewing court to annul the board's order. The statute provided the owner could "recover damages and costs," Mass.Gen.Laws Ann. ch. 111, § 150, and the court concluded that this was adequate assurance that piggery owners would be compensated for the temporary and wrongful interruption of their business. *Board of Health of Franklin* is not applicable here. There the only possible damage contemplated by the statute was the interruption of the owner's piggery. By contrast, here it is a strained and generous construction to read the "any damage" language of section 22 to include compensation for the permanent physical occupation of the property.

Accordingly, I conclude that section 22 is unconstitutional because it does not provide for compensation to landlords for the installation of cable on their property. While this conclusion is dispositive of this case, in the interests of completeness, I address the further contentions.

### 2. FREE SPEECH VIOLATION

Lincoln contends that section 22 violates its First Amendment free speech rights because it compels Lincoln to go into the cable television business with Cablevision,

---

5. The Legislature has before it H.B. 4033, a proposed amendment to chapter 166A modeled after the New York statute impliedly upheld in *Loretto.* The bill would allow a property owner to demand "reasonable compensation to be paid" by a cable operator in exchange for "permitting the installation of CATV system equipment on" his property. Compensation would, in most cases, be limited to a $1 payment. However, a property owner could seek more than the $1 payment by bringing an action before the Community Antenna Television Commission; the property owner would have to show that he has a "specific alternative use for the space occupied by CATV facilities or equipment" or that installation of the CATV facilities would cause a "decrease in the resale or rental value" of the property.

Cablevision argues that subsequent legislative history cannot be used to discern original legislative intent. *See Commissioner v. Engle*, 464 U.S. 206, 223 n. 21, 104 S.Ct. 597, 607 n. 21, 78

L.Ed.2d 420 (1984) ("deliberations in subsequent sessions of Congress that never culminated in legislation" are of little help in determining legislative intent). Certainly H.B. 4033's introduction, by itself, is not conclusive that the earlier Legislature which enacted section 22 did not intend for cable operators to pay just compensation. First, H.B. 4033 has not been adopted and so cannot be interpreted as evidence of the current Legislature's feelings about the constitutional adequacy of section 22. Second, it is possible that H.B. 4033's sponsors are satisfied that section 22 is constitutional, but simply wish to avoid litigation similar to that here by clarifying the Legislature's intent and furnishing a more precise method for determining compensation.

Still, it is notable that legislators feel the need, after *Loretto*, to refine section 22 and it is instructive to contrast section 22 with the carefully crafted compensation mechanism elaborated in H.B. 4033.

and forces Lincoln to allow a government-licensed speaker onto its property.

There is no small irony in Lincoln invoking putative First Amendment free speech rights in its effort to exclude Cablevision. One of Congress' concerns in fashioning a federal cable policy was to keep landlords from blocking cable operators' access to their property so that they can arrange for an alternate satellite master antenna television system (SMATV) to serve their property and receive payments from the SMATV operator for delivering a captive audience.[6] The House Committee on Energy and Commerce report noted

> that it is unfortunate that around the country with increasing frequency citizens are being denied the ability to gain access to cable service because of refusals of landlords or property owners to permit cable operators to wire the premises. These actions permit landlords and property owners in the position of being information gatekeepers, deciding which electronic information will pass into the home and which will not, enabling real estate property interests to be the ultimate electronic editors. The threat these practices pose to the goal of information diversity in the electronic age is very clear and present.

H.R.Rep. No. 934, 98th Cong., 2d Sess. 79–80 (1984), *reprinted in* 1984 U.S.Code Cong. & Ad.News 4655, 4716–17. Later, the Committee explained that

> one of the root causes for landlords denying their residents access to cable service has been the incentive building and mobile home park owners presently have to enter into financial relationships with the providers of satellite master antenna television systems (SMATV's). Since traditional SMATV systems are not franchised and do not pay a franchise fee, building and home park owners have found SMATV operators willing to enter into arrangements which provide landlords the ability to share some of the

revenues derived from the provision of SMATV service to the property's residents.

*Id.* at 82, U.S.Code Cong. & Ad.News 4655 at 4719.

The challenged statute must be struck down, Lincoln argues, because it serves the "narrow and parochial" interests of cable operators and not a compelling state interest, and it is not the least intrusive means of promoting the state interests it does serve. Defendants' Memorandum at 22.

Relying on *Preferred Communications, Inc. v. City of Los Angeles*, 754 F.2d 1396 (9th Cir.), *cert. granted,* 474 U.S. 979, 106 S.Ct. 380, 88 L.Ed.2d 333 (1985), Lincoln first argues that cable television enjoys First Amendment protection. For that reason, Lincoln says, it can't be required to go into the cable television business. But section 22, Lincoln concludes, does just that: by compelling Lincoln to permit Cablevision access to its property to install cable television equipment, Lincoln has been forced to "engage in a communications venture" with Cablevision. Defendants' Memorandum at 20. Lincoln construes the provision in section 22 providing that a property owner can enforce a cable operator's promise to be bound by the terms of section 22 in a contract action to mean that Lincoln and Cablevision will be contractually-bound partners in the cable television business. The result, Lincoln urges, is a serious infringement on its "fundamental First Amendment right to choose how to use [its] property for speech purposes." Defendants' Memorandum at 21.

Lincoln really makes two separate arguments. The first, based on *Preferred Communications,* is that section 22 forces it into the cable television business. The second, based on *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980), is that section 22 forces Lincoln to permit someone else to

---

**6.** It is not clear from the pleadings whether Lincoln and American Satellite Cable Corporation—the SMATV operator who has installed its television system at Lincoln Village with Lincoln's permission—have agreed to a revenue splitting arrangement. Moreover, even if they have there is certainly nothing wrong in doing so. Still, the First Amendment interests that are important here are those of Lincoln Village residents and not those belonging to their landlord.

use its property for speech purposes. Neither argument is persuasive.

■ It is true that cable television enjoys some First Amendment protections. *See, e.g., Preferred Communications,* 754 F.2d at 1403. The concern, however, has been government regulation of content and the franchising process whereby local governments regulate access to cable television markets, not the novel claim Lincoln raises here—that it is constitutionally protected from being forced against its wishes into the cable television business. It is not necessary to reach this claim, however.

Section 22 does not, as Lincoln contends it does, force Lincoln into the cable television business as Cablevision's contractual partner. Cablevision is obliged under section 22 to promise Lincoln that Cablevision will be bound by the terms of section 22, including principally the requirements that Cablevision indemnify Lincoln for any property damage caused by installing cable equipment, and not interfere with the "safety, functioning and appearance" of Lincoln's property. Cablevision's promise is enforceable in a contract action. This contractual enforcement provision, however, does not mean that Cablevision and Lincoln are business partners in the cable television business. It merely specifies how a property owner should enforce the terms of section 22; Lincoln would have had rights enforceable against Cablevision even if the Legislature had deleted the contractual enforcement language. The arrangement between Cablevision and Lincoln is no different than that between Lincoln and a public utility to whom Lincoln grants an easement. If the public utility overburdens the easement, or abandons it, Lincoln can enforce its terms in a contract action. That does not mean that Lincoln and the public utility are in business together.

■ Lincoln also challenges section 22 on the ground that it forces Lincoln to allow a government-licensed speaker—Cablevision—to use Lincoln's property for speech purposes, violating Lincoln's right to choose how to use its property. Lincoln relies on three Supreme Court cases involving state regulation of speech on private property. *PruneYard Shopping Center,* 447 U.S. at 74, 100 S.Ct. at 2035; *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977); *Miami Herald Publishing Company v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974).

In *Wooley,* the Court concluded that a state could not compel a motorist to display the state's motto which was printed on its license plates and could not bar him from taking measures to cover up the motto. *Tornillo* struck down a Florida statute requiring a newspaper to publish a political candidate's reply to criticism previously published in the newspaper. Lincoln urges this Court to focus on Justice Powell's concurring opinion in *PruneYard* where he declared that "First Amendment interests are affected by state action that forces a property owner to admit third-party speakers", concluding that "even when no particular message is mandated" the compelled access can be unconstitutionally intrusive. *Id.* 447 U.S. at 98, 100 S.Ct. at 2049 (Powell, J., concurring). From these precedents, Lincoln concludes that it has a "fundamental First Amendment right to choose how to use [its] property for speech purposes." Defendants' Memorandum at 21.

*Wooley, Tornillo* and *PruneYard* do not, however, support Lincoln's contention. *Wooley* turned on the fact that "the government itself prescribed the message" and required it to be displayed on personal property that was used as "part of [appellee's] daily life." *PruneYard,* 447 U.S. at 87, 100 S.Ct. at 2044. *Tornillo* rested on the First Amendment principle that the state can't tell newspapers what to publish, and the related danger that the statute would "dampe[n] the vigor and limi[t] the variety of public debate" because editors would be fearful that controversial news stories and editorials might trigger application of the statute. *Id.* at 257. Nothing in section 22 dictates the content of the television signals that will be transmitted to Lincoln Village tenants. As a landlord, Lincoln is in no way similar to the newspaper editors in *Tornillo;* Lincoln cannot, by refusing to permit access to its property,

make choices about what television messages its tenants receive and it cannot use its ownership of the apartment complex, and the putative First Amendment rights that involves, to act as an editor on behalf of its tenants.

It is *PruneYard* which is most instructive in this case, not *Wooley* and *Tornillo*. *PruneYard* involved California's power under its state constitution to permit individuals to exercise free speech and petition rights on the property of a privately owned shopping center to which the public is invited. The Court rejected the shopping center's contention that this was a violation of its First Amendment right to control use of its property for speech purposes. Distinguishing *Wooley* the Court found that the property owner invited the public onto his property; that the state did not dictate the messages displayed; and, that the views expressed by persons passing out pamphlets and gathering petition signatures would not be "identified with those of the owner." *Id.* at 87, 100 S.Ct. at 2044. All three are present here. Lincoln has chosen not only to invite the public onto its property, it leases rights to possess its property to its tenants. There is no dictation by the Commonwealth of the messages to be transmitted by Cablevision to its subscribers. The Commonwealth's franchising process is not, as Lincoln contends, analogous to the auction struck down in *Preferred Communications*, 754 F.2d at 1409. Finally, there is no reason to believe that Lincoln's tenants will assume that Lincoln endorses messages transmitted into tenants' apartments at their request. *See Direct Satellite Communications, Inc. v. Board of Public Utilities*, 615 F.Supp. 1558, 1568, No. 84–4990, slip op. at 14–17 (D.N.J.1985). As far as this argument is concerned, then, Lincoln cannot prevail.

### 3. EQUAL PROTECTION

■ Lincoln contends that the Massachusetts statute is contrary to the Equal Protection Clause of the Fourteenth Amendment because it discriminates between licensed cable operators who enjoy a statutorily-enforced right of access, and competing television companies which can be denied access to apartment complexes such as Lincoln Village and must negotiate with property owners. Because the discriminatory effect of section 22 unfairly restricts First Amendment free speech rights of alternative television services, Lincoln argues, section 22 must be shown to be the least restrictive means to achieve a compelling state interest to be constitutional.

There is no need to reach the merits of Lincoln's equal protection claim because Lincoln fails to establish its standing to litigate those claims on behalf of alternative television services who do not enjoy the enforced access right enjoyed by franchised cable operators under section 22.

Beyond the constitutional requirements of Article III which limit the judicial power of federal courts to "cases" and "controversies," the Supreme Court has also fashioned a "set of prudential principles that bear on the question of standing," including the principle that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Valley Forge College v. Americans United*, 454 U.S. 464, 474, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982), (quoting *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)). Lincoln argues that it fits within the exception to this rule that "vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Craig v. Boren*, 429 U.S. 190, 195, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976).

Lincoln must first show that it itself is injured by section 22, before it can raise constitutional claims belonging to alternative television services who might seek access to Lincoln Village. Id. at 194–95, 97 S.Ct. at 455; *Singleton v. Wulff*, 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976); *Warth*, 422 U.S. at 498–500, 95 S.Ct. at 2204–05; *Tileston v. Ullman*, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1944). Lincoln is "injured" in the narrow sense that section 22 imposes on it a legal duty to

permit Cablevision to install cable facilities on its property. Lincoln's refusal to permit access forced it to appear here as a defendant in Cablevision's enforcement proceeding.

Lincoln argues that it is also harmed by section 22 because it is forced to give up its property rights in whatever space will be taken up by Cablevision's equipment in what amounts to a forced sale. With other competing television services, Lincoln is free to negotiate whether to sell at all and under what terms. This alleged harm is ameliorated, however, by the just compensation Lincoln rightfully contends it must receive from Cablevision. The forced sale to Cablevision is harmful only if Lincoln doesn't receive a fair price for whatever property rights it is obliged to transfer to Cablevision.

More difficult is the question of what claims Lincoln may press in challenging section 22. Lincoln claims that it has standing to assert the equal protection claims of alternative television services who do not enjoy the statutory right of access section 22 grants to licensed cable operators such as Cablevision. I disagree, and conclude that Lincoln does not have standing to assert those claims.

First, Lincoln makes no showing that alternative television services are injured by section 22. The challenged statute does not prevent alternative television services from trying to gain access to Lincoln Village to compete with Cablevision. Lincoln admits that it has already negotiated an agreement with an alternative television service, American Satellite Cable Corporation, under which that company will install a satellite master antenna television system at Lincoln Village. Subscribing tenants will pay 20–25% less than they will be charged by Cablevision and will receive at least equal service. Affidavit of Salvatore Carabetta. Under section 22, Cablevision and Lincoln are barred from "directly or indirectly diminish[ing] or interfer[ing] with existing rights of any tenant or other occupant of [Lincoln Village] to use of master or individual antenna equipment." It is true that Cablevision will compete with American Satellite to enlist Lincoln Village tenants as subscribers. But any firm that offered television service to Lincoln Village tenants would compete with American Satellite, whether it secured its access through negotiated agreement with Lincoln or through section 22. Thus, this alleged injury has nothing to do with discrimination against unfranchised alternative television services. *See Direct Satellite Communications, Inc. v. Board of Public Utilities*, 615 F.Supp. 1558 (D.N.J.1985) (satellite master antenna television company providing service to condominium developments lacks standing to raise equal protection challenge to mandatory access statute because competition from a franchised cable operator is not a "colorable injury related to the State's alleged denial of equal protection of the laws").

Second, Lincoln fails to show that it is a "proper proponent of the particular legal rights on which [it] bases [its] suit." *Singleton*, 428 U.S. at 112, 96 S.Ct. at 2873. A party who seeks to assert constitutional rights of third-parties must be an appropriate advocate of those rights who can be "expected properly to frame the issues and present them with the necessary adversarial zeal." *Secretary of State of Maryland v. Joseph H. Munson Company, Inc.*, 467 U.S. 947, 104 S.Ct. 2839, 2847, 81 L.Ed.2d 786 (1984). "[T]hird parties themselves usually will be the best proponents of their own rights," and courts prefer "to construe legal rights only when the most effective advocates of those rights are before them." *Singleton*, 428 U.S. at 114, 96 S.Ct. at 2874. By recognizing this fact, courts ensure that they approach cases from the point of view of those whose rights are at stake and avoid needless and perhaps counterproductive litigation. *Friedman v. Harold*, 638 F.2d 262, 267 (1st Cir.1981) (citation omitted).

Lincoln, relying on *Craig*, argues that its potential vendor-purchaser relationships with alternative television services qualifies it to assert their equal protection objections to section 22. Lincoln's reliance on *Craig* is misplaced.

*Craig* involved an Oklahoma statute which prohibited the sale of "nonintoxicating" 3.2% beer to males under the age of 21 and to females under the age of 18. *Id.* 429 U.S. at 193–94, 97 S.Ct. at 454–55. .The standing question was whether a licensed beer vendor could challenge the statute on her own behalf, and whether she could rely on the equal protection objections of males 18–20 years of age. The Court held the vendor suffered injury in fact because her only choice was to obey the statute and suffer a "direct economic injury through the constriction of her buyers' market," *id.* at 194, 97 S.Ct. at 455, or disobey the statute and jeopardize her license. The vendor could effectively litigate the equal protection claims of males 18–20 years of age because it was threatened governmental sanctions against beer vendors that deterred young males from purchasing 3.2% beer; the Oklahoma statute did not make it unlawful for minors to purchase 3.2% beer. The beer vendor and the young males had identical interests in challenging the statute. "[V]endors and those in like positions," the Court concluded, "have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Id.* at 195, 97 S.Ct. at 456.

All the vendor-purchaser cases involve close professional relationships or statutes that directly restrict a vendor's right to sell or distribute. *E.g., Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Planned Parenthood officer and licensed physician who dispense contraceptives have standing to assert privacy rights of married couples in challenging state statute making unlawful the use of contraceptives); *Singleton,* 428 U.S. at 106, 96 S.Ct. at 2868 (physicians challenging state statute excluding most abortions from Medicaid coverage can assert equal protection objections of women patients seeking abortions); *Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (mail-order contraceptive distributor has standing to assert privacy rights of potential customers in challenging state statute restricting sale, distri-

bution and advertising of contraceptives). The interests of the litigant and the rights of the third party must be "mutually interdependent" so that the rights of the third party will be "diluted or adversely affected" if the litigant's constitutional challenge fails, *Craig,* 429 U.S. at 195, 97 S.Ct. at 455, or there must be a close, strong relationship between the litigant and the person whose rights he asserts. *Singleton,* 428 U.S. at 114, 96 S.Ct. at 2874; *Eisenstadt v. Baird,* 405 U.S. 438, 445, 92 S.Ct. 1029, 1034, 31 L.Ed.2d 349 (1972).

Here section 22 does not restrict Lincoln's ability to sell access to its apartment complex to anyone, including alternative television services. As a practical matter, of course, Lincoln has already sold access to an alternative television service. But even if Lincoln had not already permitted a satellite master antenna television service to install its equipment at Lincoln Village, there is nothing in section 22 that would restrict its ability to do so, even after Cablevision installed its facilities. Nor is there any showing that the installation of Cablevision's equipment will make that right to sell access to other, competing television services a hollow one. This is simply not a case where a legislature sought to restrict vendors or suppliers of objectionable products or services, and where the vendors were thus entitled to press the constitutional claims of their potential purchasers. The right of alternative television services to compete for subscribers and seek access to apartment buildings is not affected by the requirement that Lincoln permit access to a licensed cable operator who seeks to install cable facilities. More important, Lincoln's interest in toppling section 22 and the equal protection rights of alternative television services are not congruent. Lincoln asserts that it is harmed by section 22 because it loses the ability to sell access to its apartment complex to whomever it chooses and, perhaps more important, because it loses the ability to refuse to sell access. Alternative television services, however, might very well take a different view of section 22. Their interest in challenging

the statute might be to secure for themselves the same statutory right of access the franchised cable operators now enjoy.

Alternative television services who feel aggrieved by section 22 can challenge it on their own behalf. Lincoln makes no showing that alternative television services are prevented by some obstacle or burden from litigating their constitutional objections to section 22. There is no concern, for example, that alternative television services might be dissuaded by embarassment from pressing their rights as in the birth control and abortion cases. *See, e.g., Singleton,* 428 U.S. at 115–16, 96 S.Ct. at 2874–75. Nor is the statute challenged in this case similar to that in *Craig* which penalized not use but sale and was directed at beer sellers not underage males, and thus made would-be vendors the "least awkward challenger[s]." *Id.* 429 U.S. at 197, 97 S.Ct. at 456; *see also Eisenstadt,* 405 U.S. at 446, 92 S.Ct. at 1034. Whatever the merits of the equal protection objections to section 22, Lincoln lacks standing to litigate them.

## B. CABLE COMMUNICATIONS POLICY ACT OF 1984, § 621(a)(2)

■ Cablevision also seeks an injunction ordering Lincoln to allow it to make full use of easements Lincoln has granted to public utilities at Lincoln Village. Cablevision relies on the recently-enacted Cable Communications Policy Act of 1984, 47 U.S. C.A. §§ 521–559 (West Supp.1985). Section 621(a)(2) of the Act, 47 U.S.C.A. § 541(a)(2), provides that a cable franchise is "construed to authorize the construction of a cable system over public rights-of-way, and through easements ... which have been dedicated for compatible uses...." [7] Cablevision contends that Lincoln's property is encumbered by easements for the use of both public and private utilities, including easements for telephone service, natural gas and electricity. Urging that the easements extend into each individual apartment, section 621(a)(2) authorizes the same broad right of access provided by the Massachusetts CATV statute.

Lincoln concedes that section 621(a)(2) permits Cablevision to make use of whatever easements and public rights-of-way there might be on its property (so long as such use is compatible), but argues that this does not mean that Cablevision can install a complete CATV system using those easements alone. First, Lincoln argues, as a factual matter, that the utility easements at Lincoln Village do not extend into each apartment; at some point in order to wire Lincoln Village, Cablevision's equipment will leave the easements and pass onto Lincoln's property. Second, Lincoln asserts that the result Cablevision urges is inconsistent with Congress' intent in enacting the Act. Congress wanted to solve the problem of recalcitrant utilities unwilling to share their easements with cable operators. Congress specifically retreated, Lincoln insists, from adopting such a broad right of access; an early version of the Act contained language that forced landlords to permit cable operators to install cable equipment on their property, but these provisions were deleted. Finally, Lincoln asserts that to the extent section 621(a)(2) does permit Cablevision access to Lincoln's

7. Section 621(a), 47 U.S.C.A. § 541(a) provides:
(1) A franchising authority may award, in accordance with the provisions of this subchapter, 1 or more franchises within its jurisdiction.
(2) Any franchise shall be construed to authorize the construction of a cable system over public rights-of-way, and through easements, which is within the area to be served by the cable system and which have been dedicated for compatible uses, except that in using such easements the cable operator shall ensure—
(A) that the safety, functioning, and appearance of the property and the convenience and safety of other persons not be adversely affected by the installation or construction of facilities necessary for a cable system;
(B) that the cost of the installation, construction, operation, or removal of such facilities be borne by the cable operator or subscriber, or a combination of both; and
(C) that the owner of the property be justly compensated by the cable operator for any damages caused by the installation, construction, operation, or removal of such facilities by the cable operator.
(3) In awarding a franchise or franchises, a franchising authority shall assure that access to cable service is not denied to any group of potential residential cable subscribers because of the income of the residents of the local area in which such group resides.

property against Lincoln's wishes, it authorizes an unconstitutional taking of property without compensation; Lincoln also raises the free speech and equal protection claims it raised against the Massachusetts statute.

Lincoln's constitutional challenges are without merit. Section 621(a)(2) does ensure that property owners will be fully compensated for whatever taking of their property occurs when cable facilities are installed, by providing that "the owner of the property [shall] be justly compensated by the cable operator for any damages caused by the installation, construction, operation, or removal of [cable] facilities by the cable operator." Lincoln's claim that because an unenacted provision contained a more complicated compensation scheme that Congress changed its mind and did not, finally, intend for property owners to be compensated is not persuasive. The legislative history explicitly refers to the Supreme Court's decision in *Loretto,* and notes that section 633 was drafted to comply with the constitutional requirements set forth in that decision. H.R.Rep. No. 934, 98th Cong., 2d Sess. 80–81 (1984), *reprinted in* 1984 U.S.Code Cong. & Ad.News 4655, 4717–18. Except for the provision detailing a method for determining what constitutes just compensation, section 621(a)(2) fully incorporates the compensation provisions of the unenacted section 633. Even if the language of section 621(a)(2) were ambiguous, which it is not, there is simply no basis on which Lincoln can argue that Congress did not intend that property owners be fully compensated for whatever takings might occur from the installation of cable facilities.

Finally, it is unclear just what property Lincoln suggests will be taken without compensation. Section 621(a)(2) gives Cablevision the right to use easements or public rights-of-way dedicated for electric, gas, telephone or other such utility transmissions. Whether Cablevision's exercise of this new right will constitute a taking of property will depend on whether Cablevision's use of a given easement or right-of-way amounts to an additional servitude on the underlying property. If no additional burden is imposed, no taking of property

will occur. Lincoln does not contend that Cablevision's cable facilities, if installed, would not be a compatible use with the existing easements, though it vigorously disagrees with Cablevision's assertion that it can install a complete CATV system at Lincoln Village using only existing utility easements and public rights-of-way.

Lincoln's other constitutional objections are identical to those it raised against the Massachusetts CATV statute; they are not persuasive here, either.

Without reaching the issue of Congress' purpose in discarding section 633, there remains the question whether Cablevision can install a complete CATV system at Lincoln Village using nothing but existing utility easements and public rights-of-way. *See* Meyerson, The Cable Communications Policy Act of 1984: A Balancing Act on the Coaxial Wires, 19 Ga.L.Rev. 543, 610–12 (1985). Because this Court is not persuaded that Cablevision can do so, there is no purpose to be served at this point in enjoining Lincoln from barring Cablevision's use of the easements. Given Lincoln's refusal to permit Cablevision to install its cable facilities at Lincoln Village, Cablevision must rely on the access provision of the Massachusetts CATV statute.

## *Conclusion*

Obviously, this case presents a close and difficult question. Section 22 can be read several ways. This Court's task in construing this statutory provision, however, is to ascertain the Legislature's intent and I am convinced from the language the Legislature chose to express its intent, that in drafting section 22, the Legislature did not contemplate a compensated taking of private property as a consequence of the mandatory access provisions. Having arrived at that conclusion, I am not prepared to indulge in remedial legislating by revising section 22 to comport with the constitutional guidelines. Rewriting a defective statute is not the province of the judiciary. Rather than supplement or strain the Legislature's language to avoid the constitutional challenge, I believe the sounder approach is to leave to the Legislature the

**1260**

task of remedying section 22's constitutional shortcomings.

Therefore, the defendants' motion to dismiss must be allowed and the complaint ordered dismissed.

SO ORDERED.