[No. B005534. Second Dist., Div. Four. Mar. 18, 1985.]

BENJAMIN B. SALVATY et al., Plaintiffs and Appellants, v.
FALCON CABLE TELEVISION et al., Defendants and Respondents.

## COUNSEL

Benjamin B. Salvaty III and John H. Ernster for Plaintiffs and Appellants.

Henry S. Barbosa, Bart Kimball, John Keiser and Jacqueline Minor Holmes for Defendants and Respondents.

Farrow, Schildhause, Wilson & Rains, Harold R. Farrow, E. Nicholas Selby, William Winter, Coblentz, Cahen, McCabe & Breyer, and Richard R. Patch as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**WOODS, P. J.**—■ The issue in this case is whether a telephone company and cable television company had to secure a private property owner's consent before cable television equipment was installed on a telephone pole situated on the telephone company's easement on the property. We find that no such consent was required as the cable equipment was within the scope of the easement which the telephone company apportioned to the cable company.

Benjamin B. Salvaty and Marion R. Salvaty are appealing the dismissal of their second amended complaint after the trial court sustained without leave to amend the demurrers of respondents Falcon Cable Television (Falcon) and Pacific Telephone and Telegraph Company (Pacific). Amici curiae briefs have been filed on Falcon's behalf by the California Cable Television Association and by Tele-Communications, Inc.

Appellants' second amended complaint contained causes of action for inverse condemnation, trespass, nuisance, unfair business practices as proscribed by Business and Professions Code section 17200, and false and fraudulent misrepresentation as proscribed by Business and Professions Code section 17500.

According to the second amended complaint and the documents which were judicially noticed,[1] the facts were as follows:

Appellants reside and own a lot in the City of Alhambra. In 1926, when appellants' predecessors in interest conveyed the lot, they reserved "unto themselves, their heirs and assigns, an easement over, across and upon the rear five (5) feet of the premises hereby conveyed, for the construction, operation, repair and maintenance thereon and thereover of a pole line for the stringing of telephone and electric light and power wires thereon; provided, however, the second parties may occupy and utilize the surface of said strip of land subject to said easement in a manner not inconsistent therewith."

In 1979, Pacific and Falcon entered into a license agreement (pole attachment agreement) under which Pacific contracted to permit Falcon to place its equipment in or on Pacific's conduit system and telephone poles.[2] The agreement included a requirement that Falcon obtain from "private owners of real property any and all permits, licenses or grants *necessary* for the lawful exercise of the permission granted by any application approved hereunder. . . ." (Italics added.) The agreement emphasized that Falcon's use of Pacific's equipment was only a license and would not create any ownership or property rights in that equipment.

In 1980, the City of Alhambra awarded a franchise to Falcon to provide cable television services within the city limits. The franchise agreement

---

[1] The trial court took judicial notice of two ordinances of the City of Alhambra and the pole attachment agreement between Pacific and Falcon.

Appellants argue that the pole attachment agreement was not a proper subject for judicial notice because there was no proof that it had been filed with the Public Utilities Commission, as required by section 489 of the Public Utilities Code and Cal. Community Television Assn. v. Gen. Tel. & So. Cal. Edison Co. (1970) 71 Cal.P.U.C. 123, 129. It is true that the copies of the agreement proffered to the trial court were not certified. However, appellants referred repeatedly to the agreement throughout their complaint, and alleged on information and belief that it had been approved by the commission. The trial court was given no reason to believe otherwise. Given the references to the agreement in the complaint, Falcon and Pacific were entitled to present the trial court with the complete document.

Appellants' counsel states in a footnote in their brief that when he went to the local Public Utilities Commission office, the staff there were unable to locate information that the agreement had been filed. We decline to consider that information, which was not part of the record below.

[2] The complaint does not indicate how or when Pacific acquired the rights to the easement which had been reserved in 1926.

contained a provision authorizing Falcon to install its equipment on any public street and on property rented or leased from other persons, including any public utility. The city also adopted an ordinance making it unlawful for any private property owner to interfere with a cable television company's access to the private property.

Pursuant to its agreement with Pacific and the franchise from the city, Falcon installed cable television equipment on appellants' property without seeking or obtaining appellants' consent. This lawsuit ensued.

Pacific and Falcon have taken divergent positions both here and below. Pacific argues that it authorized Falcon to install the cables on surplus pole space but gave it no right to use the easement, and that Falcon should have obtained appellants' permission as the pole attachment agreement required it to obtain any necessary permission. Falcon contends that no permission was necessary because the cable attachment was within the scope of the easement. We question the logic of Pacific's position, but need not explore it as the correctness of Falcon's position justified the trial court's granting the demurrers of both defendants.

In 1980, the Legislature enacted section 767.5 of the Public Utilities Code[3] as emergency legislation to regulate the use by cable television cor-

---

[3]Public Utilities Code section 767.5 reads: "(a) As used in this section: [¶] (1) 'Public utility' includes any person, firm, or corporation, except a publicly owned public utility, which owns or controls, or in combination jointly owns or controls, support structures or rights-of-way used or useful, in whole or in part, for wire communication. [¶] (2) 'Support structure' includes, but is not limited to, a utility pole, anchor, duct, conduit, manhole, or handhole. [¶] (3) 'Pole attachment' means any attachment to surplus space, or use of excess capacity, by a cable television corporation for a wire communication system on or in any support structure located on or in any right-of-way or easement owned, controlled, or used by a public utility. [¶] (4) 'Surplus space' means that portion of the usable space on a utility pole which has the necessary clearance from other pole users, as required by the orders and regulations of the commission, to allow its use by a cable television corporation for a pole attachment. [¶] (5) 'Excess capacity' means volume or capacity in a duct, conduit, or support structure other than a utility pole or anchor which can be used, pursuant to the orders and regulations of the commission, for a pole attachment. [¶] (6) 'Usable space' means the total distance between the top of the utility pole and the lowest possible attachment point that provides the minimum allowable vertical clearance. [¶] (7) 'Minimum allowable vertical clearance' means the minimum clearance for communication conductors along rights-of-way or other areas as specified in the orders and regulations of the commission. [¶] (8) 'Rearrangements' means work performed, at the request of a cable television corporation, to, on, or in an existing support structure to create such surplus space or excess capacity as is necessary to make it usable for a pole attachment. When an existing support structure does not contain adequate surplus space or excess capacity and cannot be so rearranged as to create the required surplus space or excess capacity for a pole attachment, 'rearrangements' shall include replacement, at the request of a cable television corporation, of the support structure in order to provide adequate surplus space or excess capacity. [¶] (9) 'Annual cost of ownership' means . . . . [¶] (b) The Legislature finds and declares that public utilities have dedicated a portion of such support structures to cable television corporations for pole

porations of surplus space on public utility poles and other equipment. Section 767.5, subdivision (b), is particularly pertinent: "(b) The Legislature finds and declares that public utilities have dedicated a portion of such support structures to cable television corporations for pole attachments in that public utilities have made available, through a course of conduct covering many years, surplus space and excess capacity on and in their support structures for use by cable television corporations for pole attachments, and that the provision by such public utilities of surplus space and excess capacity for such pole attachments is a public utility service delivered by public utilities to cable television corporations. [¶] The Legislature further finds and declares that it is in the interests of the people of California for public utilities to continue to make available such surplus space and excess capacity for use by cable television corporations."

As appellants point out, section 767.5 concerns relations between public utilities and cable television corporations and states nothing regarding private property owners. The section does, however, show a strong public policy in favor of encouraging the type of cable attachments involved in this case.

Appellants argue strenuously that cable television equipment was not within the scope of the easement here, which provides only for "a pole line for the stringing of telephone and electric light and power wires thereon. . . ." *Faus* v. *City of Los Angeles* (1967) 67 Cal.2d 350, 355-358 [62 Cal.Rptr. 193, 431 P.2d 849], and *Norris* v. *State of California* ex rel. *Dept. Pub. Wks.* (1968) 261 Cal.App.2d 41, 47 [67 Cal.Rptr. 595], counsel to the contrary.

In *Faus*, the grantors conveyed easements from 1901 to 1911 for public electric railway service. In 1955, public motor coach service was substituted pursuant to an order of the California Public Utilities Commission. The Supreme Court rejected the plaintiff's contention that the change of use terminated the easement, stating: "Our courts have been receptive to the contention that changed economic and technological conditions require re-evaluation of restrictions placed upon the use of real property. . . ." (*Faus* v. *City of Los Angeles, supra,* 67 Cal.2d at p. 355.) As the court analyzed the problem, the real issue was whether the use in a particular case was

---

attachments in that public utilities have made available, through a course of conduct covering many years, surplus space and excess capacity on and in their support structures for use by cable television corporations for pole attachments, and that the provision by such public utilities of surplus space and excess capacity for such pole attachments is a public utility service delivered by public utilities to cable television corporations. [¶] The Legislature further finds and declares that it is in the interests of the people of California for public utilities to continue to make available such surplus space and excess capacity for use by cable television corporations. [¶] . . . ."

consistent with the primary object of the grant. (*Id.*, at pp. 356-357.) "[T]he sole and exclusive purpose [of the substitution] has merely been to up-date the transportation system so that a modern vehicular means of transport may be utilized in place of an outmoded one." (*Id.*, at p. 358.) Given the public interest in improved transportation, the substitution was proper. (*Ibid.*)

Similarly, in *Norris* v. *State of California* ex rel. *Dept. Pub. Wks.*, *supra*, 261 Cal.App.2d 41, an easement of lake front property had been granted in 1930 for highway purposes. The state built the highway. In 1964, the state began using a portion of the area for a vista point and roadside rest. *Norris* relied upon *Faus* in holding that these changes were not a surcharge of the easement "but a contemplated prospective modernization of a legitimate highway use." (*Id.*, at pp. 47-48.)

In the case at bench, the addition of cable television equipment on surplus space on the telephone pole was within the scope of the easement. Although the cable television industry did not exist at the time the easement was granted, it is part of the natural evolution of communications technology. Installation of the equipment was consistent with the primary goal of the easement, to provide for wire transmission of power and communication. We fail to see how the addition of cable equipment to a preexisting utility pole materially increased the burden on appellants' property.

We are further persuaded by the reasoning of the New York court in *Hoffman* v. *Capitol Cablevision System, Inc.* (1976) 52 App.Div.2d 313 [383 N.Y.S.2d 674], which has been cited to us by amicus California Cable Television Association.

In *Hoffman*, the plaintiffs' predecessors had granted to a power company, a telephone company, and "'their respective successors and assigns'" the right to construct and operate equipment "'for the distribution of electricity and messages upon, under, along or across the property which we own.'" (383 N.Y.S.2d at p. 676.) The companies executed pole attachment agreements with a cable television system granting a license to install coaxial cables on existing utility poles. The agreements included a provision that any necessary authorizations be obtained from the landowner. The plaintiffs refused their permission and sought an injunction to prevent entry onto their land.

In holding that the injunction was properly denied, *Hoffman* first found that the easements were in gross rather than appurtenant as they were independent of the ownership or possession of any specific property of the utilities. (383 N.Y.S.2d at p. 676.) This is equally true of the easement

here. (See 3 Witkin, Summary of Cal. Law (8th ed. 1973) Real Property, § 341, p. 2041; Civ. Code, § 801; *City of Anaheim* v. *Metropolitan Water Dist. of Southern Cal.* (1978) 82 Cal.App.3d 763, 767 [147 Cal.Rptr. 336].)

The *Hoffman* decision continued: "Because the utilities did not divest themselves of all control over their easements in their agreements with defendant, the interest acquired by the latter cannot be considered an assignment, such as is specifically permitted by the original grant of the easements. The transactions must rather be considered as attempts by the utilities to apportion their easements (see 5 Restatement of the Law, Property, § 493). [¶] Whether an easement in gross is apportionable depends largely on whether it is viewed as exclusive as opposed to nonexclusive (5 Restatement of the Law, Property, § 493, subds. [c] and [d]). Although exclusive easements are not generally favored by our courts [citation], the very nature of the said 1954 easements obtained by the utilities indicates that they were intended to be exclusive vis-a-vis the grantor. There is no claim that plaintiffs' predecessor had, at the time the easements were granted, any authority for, any intention to seek authority for, or any interest whatsoever in 'the distribution of electricity and messages' via the said easements. Nor is there any indication that plaintiffs' predecessor or plaintiffs have at any time sought to treat the utility easements as non-exclusive by seeking to share with Niagara Mohawk or New York Telephone in 'the distribution of electricity and messages' by the easements." (383 N.Y.S.2d at p. 676.)

Similarly here, the easement is exclusive vis-à-vis appellants, who clearly have no interest in providing utility services, and cannot interfere with the easement owner's facilities. (See, e.g., *City of Los Angeles* v. *Igna* (1962) 208 Cal.App.2d 338, 341 [25 Cal.Rptr. 247].) "Though apportionability may be to the disadvantage of the possessor of the servient tenement, the fact that he is excluded from making the use authorized by the easement, plus the fact that apportionability increases the value of the easement to its owner, tends to the inference in the usual case that the easement was intended in its creation to be apportionable." (5 Rest., Property, § 493, com. [c], p. 3054.)

In holding that the easement could properly be apportioned to the cable company, the *Hoffman* court was further influenced by the facts that the cable equipment would not impose an additional burden on the servient tenement; was consistent with the policy of broadly interpreting easements to meet progressive inventions; and that cable television rendered a valuable educational and public service. (383 N.Y.S.2d at pp. 677-678.) The same considerations apply here.

Finally, the *Hoffman* court found that the language of the attachment agreement did not mean that the landowner's consent was required, as the

agreement required only that necessary permission be obtained, and such permission was not necessary. (383 N.Y.S.2d at p. 678.) Again, the same is true here.

A similar result was reached in *Jolliff* v. *Hardin Cable Television Co.* (1971) 26 Ohio St.2d 103 [55 Ohio Ops.2d 203, 269 N.E.2d 588]. The *Jolliff* court held that an easement granted to a power company "for the purpose of transmitting electric or other power, including telegraph or telephone wires," could be apportioned by the power company to permit attachment of a cable television company's equipment to the easement. (*Id.*, at p. 590.) The *Jolliff* court found that "attachment of a television coaxial cable, which is comprised of bound wires for transmitting high frequency electrical impulses, . . . constitutes no more of a burden than would the installation of telegraph and telephone wires." (*Id.*, at p. 591.)

Finally, we note that *Loretto* v. *Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419 [73 L.Ed.2d 868, 102 S.Ct. 3164], on which appellants rely, is clearly distinguishable from the case before us. *Loretto* held that a New York statute requiring a landlord to permit installation of cable television facilities upon his property amounted to a taking of private property for which compensation was due. Unlike the case at bench, there was no easement of any kind involved in *Loretto*. Here, we have an easement and the cable equipment was within the scope of that easement.

In light of our conclusion that the installation of Falcon's cable was proper, appellants have failed to state a cause of action under any of their theories. The demurrers were properly sustained without leave to amend.

The judgment is affirmed.

Arguelles, J., and Shumsky, J.,* concurred.

Appellants' petition for review by the Supreme Court was denied May 15, 1985.

---

*Assigned by the Chairperson of the Judicial Council.