DANIELS CABLEVISION,
INC., Plaintiff,

v.

SAN ELIJO RANCH, INC., and Does 1
through 50, inclusive, Defendants.

No. 01–1080–IEG(CGA).

United States District Court,
S.D. California.

July 12, 2001.

Stephen D. Kaus, Cooper White and Cooper, San Francisco, CA, for Plaintiff.

Thomas F. Geselbracht, Piper Marbury Rudnick and Wolfe, Chicago, IL, Jeffrey A. Rosenfeld, Jeffrey A. Rosenfeld, Piper Marbury Rudnick and Wolfe, Los Angeles, CA, for Defendants.

## ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

GONZALEZ, District Judge.

On June 15, 2001, plaintiff Daniels Cablevision, Inc. ("plaintiff") filed a complaint against defendant San Elijo Ranch, Inc. ("defendant") alleging that defendant violated the Cable Communications Policy Act, 47 U.S.C. § 521. In addition to its complaint, plaintiff also filed the present motion for preliminary injunction. For the reasons stated herein, the Court denies the motion for preliminary injunction.

## BACKGROUND

Plaintiff is one of two authorized cable franchisees in the city of San Marcos. The other franchisee is Times Mirror Cable Television, now called Cox Communications ("Cox Cable").

Defendant is developing a community of approximately 3,400 homes in the city of San Marcos, known as San Elijo Hills. In the course of developing the San Elijo Hills community, defendant has excavated numerous trenches ("utility trenches") for the placement of public utilities, including cable television wires and facilities.

In April 2000, plaintiff began installing its cable in the utility trenches on the San Elijo Hills development. However, in July 2000, the President of San Elijo Ranch, Paul Borden, informed plaintiff that it was obligated to pay a "trenching fee" of $250 per home in order to continue installing its cable. (*See* Odum Decl. Ex. C). Plaintiff received an invoice from defendant demanding $221,000 for the "trenching fee," and indicating that if payment was not received within 30 days, defendant would "deny [plaintiff] further access to the joint utility trenches in San Elijo Hills."[1] (*See id.*)

According to defendant, Cox Cable (plaintiff's direct competitor) paid the "trenching fee," and is therefore allowed to install its cable in the utility trenches before they are paved over and the development is completed.[2] (*See* Noland Decl. ¶ 4.) In addition to Cox Cable, defendant asserts that it also receives "partial reimbursement" of trenching costs from Pac Bell and San Diego Gas & Electric ("SDG & E"). (*See* Butsko Decl. ¶ 15.) Defendant claims that the customary practice is for utilities (except electric utilities) to pay a prorated portion of the trenching costs.

Although it filed final maps with the city of San Marcos offering to dedicate the platted streets as public easements, defendant asserts that the City of San Marcos

---

1. In its opposition to the present motion, defendant asserts that plaintiff is obligated to pay more than the requested $221,000 for the total trenching fee. Because plaintiff has not yet installed cable services for 2,845 of the San Elijo Hills development's 3,400 total homes, defendant requests that plaintiff pay the $250 per home fee for each of these remaining homes—for a total of $711,250. (*See* Def.'s Opp'n at 8.)

2. Plaintiff claims that Cox Cable actually paid defendant for the exclusive right to provide cable in the San Elijo Hills development. (*See* Pl.'s Mem. of P. & A. in Supp. of Mot. for Prelim. Inj. at 6.) Plaintiff maintains that the arrangement between defendant and Cox Cable is suspicious, and notes that despite defen-

dant's assertion that Cox Cable paid the identical $250 per home fee for the same right to access the utility trenches, defendant refuses to provide a copy of its agreement with Cox Cable.

However, the true nature of defendant's relationship with Cox Cable is a factual question more appropriately resolved after the parties have had adequate opportunity to conduct discovery. For the purposes of this Court's review of the present motion, the Court will assume that Cox Cable paid the same fee offered to plaintiff for the right to install its cable in the utility trenches on the San Elijo Hills development, and did not receive any additional benefits or promises in exchange for this payment.

has not yet accepted the improvements, and the utility trenches have not yet been formally "dedicated" to the public under California law. *See* CALIFORNIA GOVERNMENT CODE § 66477.2.

On June 15, 2001, after several weeks of unsuccessful negotiations between the parties, plaintiff filed a motion for a temporary restraining order ("TRO"), requesting that the Court enjoin defendant from interfering with plaintiff's installation of cable facilities within the San Elijo Hills development.

On June 21, 2001, the Court issued a TRO prohibiting defendant from excluding plaintiff from accessing the utility trenches in the San Elijo Hills development, pending the Court's ruling on the present motion for preliminary injunction. Pursuant to the Court's order, plaintiff posted a security bond in the amount of $50,000.

## DISCUSSION

### A. LEGAL STANDARD—PRELIMINARY INJUNCTION

■ A preliminary injunction is a provisional remedy designed to preserve the status quo and to prevent irreparable loss of rights prior to judgment. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir.1984). To satisfy its burden, the party moving for a preliminary injunction "must show either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that serious questions [going

to the merits] are raised and the balance of hardships tips sharply in the moving party's favor." *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217 (9th Cir.1987). "These tests are not two distinct tests, but rather the opposite ends of a single 'continuum in which the required harm varies inversely with the required showing of meritoriousness.'" *Id.* (quoting *San Diego Comm. Against Registration & the Draft v. Governing Bd. of Grossmont Union High Sch. Dist.*, 790 F.2d 1471, 1473 n. 3 (9th Cir.1986)). For "affirmative" or "mandatory" injunctions that *alter* the status quo, rather than simply preserve it, many courts hold the party seeking the injunction to the higher standard of showing a "clear"or "substantial" likelihood of success. *Dahl v. HEM Pharmaceuticals Corp.*, 7 F.3d 1399, 1403 (9th Cir.1993). Importantly, the factual determinations made at the preliminary injunction stage, and the legal conclusions drawn from them, are not final adjudications on the merits; instead, the court "need only find probabilities that the necessary facts can be proved." *Sierra On-Line, Inc.*, 739 F.2d at 1423.

### B. THE CABLE COMMUNICATIONS POLICY ACT

Enacted in 1984, the Cable Communications Policy Act ("Cable Act"), 47 U.S.C. § 521, established a national framework to regulate the rapid expansion of the cable industry across the country.[3] To that end, the Cable Act includes a provision which

---

3. Congress articulated the overall purpose of the Cable Act as follows: "(1) establish a national policy concerning cable communications; (2) establish franchise procedures and standards which encourage the growth and development of cable systems and which assure that cable systems are responsive to the needs and interests of the local community; (3) establish guidelines for the exercise of Federal, State, and local authority with respect to the regulation of cable systems; (4) assure that cable communications provide and are encouraged to provide the widest

possible diversity of information sources and services to the public; (5) establish an orderly process for [cable] franchise renewal which protects cable operators against unfair denials of renewal where the operator's past performance and proposal for future performance meet the standards established by this subchapter; and (6) promote competition in cable communications and minimize unnecessary regulation that would impose an undue economic burden on cable systems." 47 U.S.C. § 521.

gives cable television operators franchised by local authorities a right of access to public rights of way and to easements which are "dedicated for compatible uses" for the purpose of installing cable transmission services. Specifically, section 621(a)(2) of the Cable Act provides:

Any franchise shall be construed to authorize the construction of a cable system over public rights-of-way, and through easements, which is within the area to be served by the cable system and which have been dedicated for compatible uses....

47 U.S.C. § 541(a)(2).[4]

However, although section 621(a)(2) authorizes cable operators to access public rights of way and "dedicated" easements, it is unclear whether this provision allows a cable franchise the ability to access *private* easements in developments which have not been formally ceded to the public. A number of courts have concluded that by authorizing access to easements "dedicated for compatible uses," Congress intended to provide cable operators the right to access private, as well as public, easements. *See generally Heritage Cablevision of California, Inc. v. J.F. Shea Co.*, 1990 U.S. Dist. LEXIS 18811 (N.D.Cal.1990); *United Cable Television v. Louis J. Eyde Ltd. Family Partnership*, 1989 U.S. Dist. LEXIS 18154 (W.D.Mich.1989); *Greater Worcester Cablevision, Inc. v. Carabetta Enterprises*, 682 F.Supp. 1244 (D.Mass.1985).

However, the majority of courts analyzing this issue have determined that Congress' use of the term "dedicated" limits section 621(a)(2)'s application to easements which have been formally "dedicated" to the public, and thus, does not encompass strictly private easements. *See generally TCI of North Dakota, Inc. v. Schriock Holding Co.*, 11 F.3d 812, 817 (8th Cir. 1993); *Media General Cable v. Sequoyah Condominium Council*, 991 F.2d 1169, 1173 (4th Cir.1993); *Cable Holdings of Georgia v. McNeil Real Estate*, 953 F.2d 600, 608 (11th Cir.1992).

In the present case, plaintiff claims that section 621(a)(2) requires that defendant grant it access to the private easements[5] on the San Elijo Hills development. Thus, critical to the Court's resolution of the issues involved in this case is the meaning of the term "dedicated" under the Cable Act.[6]

The Ninth Circuit considered, but did not decide, the importance of defining the

---

4. "Compatible uses" include all normal functions of a public utility easement for the use of electric, gas, telephone, or like purposes.

5. Defendant asserts that there is a distinction between easements, which are legal rights to use real estate for certain purposes, and utility trenches, which are the physical product of invested labor and capital. *See Olson v. H & B Properties, Inc.*, 118 N.M. 495, 882 P.2d 536 (1994). Therefore, defendant argues that even if the Court determines that plaintiff has the right to use private easements under the Cable Act, it does not have the right to use defendant's trenches.

However, while there may indeed be an important difference between utility trenches and easements, there is no dispute in this case that defendant granted Cox Cable the right to install its cable in the trenches. Thus, defendant's agreement with Cox Cable gave Cox a private easement in the trenches themselves under which it has the right to install cable serving the residences on the San Elijo Hills development. Courts considering access lawsuits under the Cable Act have similarly conflated these terms, presumably for convenience purposes. *See, e.g., Centel Cable Television Company of Florida v. Admiral's Cove Assoc., Ltd.*, 835 F.2d 1359 (11th Cir. 1988); *Heritage Cablevision of California, Inc. v. J.F. Shea Co.*, 1990 U.S. Dist. LEXIS 18811 at *7 (N.D.Cal.1990).

Therefore, for the sake of convenience, the Court will refer to the utility trenches and private easements on the San Elijo Hills development interchangeably, except where indicated otherwise.

6. The parties do not dispute plaintiff's ability to bring a suit against defendant under the Cable Act. Although not expressly provided for in the statute, several courts considering the issue have determined that the Cable Act

term "dedicated" as it is used in the access provision of the Cable Act. In *Century Southwest Cable Television v. CIIF Associates*, 33 F.3d 1068 (9th Cir.1994), the Ninth Circuit noted that to prevail under the Cable Act, a cable operator is only entitled to access easements that are "dedicated for compatible uses." The Ninth Circuit stated, therefore, that in analyzing such a claim, a court must first determine the meaning of the term "dedicated" under the Cable Act: "[d]oes the term [dedicated] mean merely 'put aside for use' of some body, such as a utility, or does it mean a grant and a gift of an interest in land for public use?" *Century Southwest*, 33 F.3d at 1070.

In proposing this question, the Ninth Circuit recognized that several circuits have held that Congress chose to use "dedicated" as the term is used in real property law—meaning that there must be a formal grant for public use in order for an easement to be "dedicated." *See id.* (citing *TCI of North Dakota*, 11 F.3d at 817 (8th Circuit); *Media General Cable*, 991 F.2d at 1173 (4th Circuit); *McNeil*, 953 F.2d at 608–09 (11th Circuit)).

However, the Ninth Circuit also recognized that proponents of the contrary interpretation maintain that "dedicated," as it is used in the Cable Act, should not be given its technical definition, but rather, should be given a meaning reflecting its common usage—such as "set aside for other purposes." *Century Southwest*, 33 F.3d at 1070. The Federal Communications Commission, charged with the administration of the Cable Act, has apparently construed the term "dedicated" in this fashion.[7]

Unfortunately, the Ninth Circuit in *Century Southwest* determined that it did not have to decide this issue because there was no evidence of existing easements on the property in that case, and therefore, the question of whether easements were "dedicated" under the Cable Act was irrelevant to its resolution. Consequently, after noting the importance of the meaning of "dedicated" to lawsuits brought under the Cable Act, the Ninth Circuit declined to offer its interpretation of that term. *Id.* at 1071.

Because plaintiff seeks forced access to private easements granted to Cox Cable on the San Elijo Hills development, this Court does not have the same luxury as the Ninth Circuit in *Century Southwest*, and must address this question. Thus, in

---

provides a right of action for a cable operator seeking to install its cable in public rights-of-way or easements dedicated for compatible uses. *See Centel Cable Television Co. v. Admiral's Cove Assoc., Ltd.*, 835 F.2d 1359, 1363 (11th Cir.1988); *Heritage Cablevision of California, Inc.*, 1990 U.S. Dist. LEXIS 18811 at *7; *United Cable Television v. Louis J. Eyde Ltd. Family Partnership*, 1989 U.S. Dist. LEXIS 18154 at *6 (W.D. Mich.1989).

**7.** Curiously, the Ninth Circuit in *Century Southwest* did not cite the only district court case from within the Ninth Circuit which had addressed this issue—*Heritage Cablevision*, 1990 U.S. Dist. LEXIS 18811. In *Heritage*, a district court in the Northern District of California determined that the grant of a private easement to a competing cable company effectively "dedicated" the easement under section 621(a)(2), entitling the plaintiff to "piggy back" on the existing private easement. *See id.* at *6. Because the easement was suitable for compatible cable use, as evidenced by its use by the rival cable company, the district court held that it was "dedicated" for compatible use under the statute. *Id.*

It is possible that the Ninth Circuit recognized the uncertainty of the district court's finding in *Heritage*. In 1992, faced with a motion to vacate the preliminary injunction, the district court revisited the issue, and noted that the law in this area "is in flux and there is no clear controlling authority." *Heritage Cablevision of California*, 1992 U.S. Dist. LEXIS 8738 at *5 (N.D.Cal.1992).

order to resolve the merits of the present motion for preliminary injunction, the Court must first determine the meaning of the term "dedicated" under section 621(a)(2) of the Cable Act.

### 1. Substantial Likelihood of Success on the Merits

■ As discussed below, the Court finds that plaintiff has not demonstrated that it has a substantial likelihood of success on the merits because the Court believes that section 621(a)(2) requires *formal dedication* of easements for public use, and does not grant a right of access to strictly private easements.[8]

#### a. Statutory Interpretation

Congress does not define the term "dedicated" within the Cable Act itself, nor does it explain in section 621(a)(2) whether a cable operator is authorized to access private easements under its provisions. The absence of an explicit definition within the statute is used by proponents of both the formal and informal definitions of the term "dedicated" to advance their respective positions—each side arguing that Congress' omission supports their interpretation. *Compare United Cable Television,* 1989 U.S. Dist. LEXIS 18154 at *6 ("the language of section 621(a)(2) contains no requirement that the easement be dedicated for public use"); Philip Kantor, *Access to Premises and Easements: Can the Cable Operator Come In?,* 19 HASTINGS COMM. & ENT. L.J. 431, 442 (1997) (noting that "there is no mention nor delineation of 'publicly dedicated easements,' or 'private easements,' nor can one be derived by

inference," and arguing that section 621(a)(2) authorizes access to private easements); *with McNeil,* 953 F.2d at 606 (noting that section 621(a)(2) does not explicitly include private easements, in support of the argument that the statute was meant to apply only to publicly dedicated easements). Based on the fact that Congress' silence on this issue can be subject to both interpretations, the Court finds neither argument particularly compelling.

However, the Court does note that where Congress uses technical words or terms of art, those words are to be construed by reference to the particular art or science involved. *See Cable Assoc., Inc. v. Town & Country Mgmt. Corp.,* 709 F.Supp. 582, 584 (E.D.Penn.1989) (citing *Corning Glass Works v. Brennan,* 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974)). Consequently, when Congress uses the term "dedicated" in addressing real property, a Court should generally construe that word in light of its meaning under real property law. According to Black's Law Dictionary, an easement is legally dedicated when the owner sets apart his private property for public use, or makes his private property public by acts evincing intent to do so. *See* BLACK'S LAW DICTIONARY 412 (6th ed.1990).

Therefore, although the Court recognizes that principles of statutory interpretation alone are not dispositive, Congress' choice of the word "dedicated" to describe the easements within the scope of the Cable Act militates towards finding that section 621(a)(2) was intended to encompass only formally "dedicated" public easements rather than those on private property.

---

**8.** The Court recognizes that in granting plaintiff's motion for a TRO, it initially found that plaintiff demonstrated a likelihood of success on the merits. (*See* Order Granting Plaintiff's Application for Temporary Restraining Order (6/22/01) at 3–4.) Following the Court's order granting the TRO, however, the Court has had the benefit of reviewing supplemental briefs filed by the parties, as well as hearing oral argument. Based on the additional briefing, as well as the Court's own independent review of the relevant law, the Court is no longer persuaded that plaintiff has demonstrated a substantial likelihood of success on the merits.

**b. To Interpret "Dedicated" Informally, Applying to Private as well as Public Easements, Would Implicate Due Process Concerns**

Plaintiff asserts that section 621(a)(2) gives cable operators the statutory right to install cable in areas of a land owner's property which are already the subject of private "compatible" easements. Therefore, under plaintiff's interpretation of the phrase "easements dedicated to compatible uses," the Cable Act authorizes it to access all private easements on defendant's property which are compatible with the installation of cable facilities.[9]

However, because adopting this interpretation of "dedicated" would necessarily mean that section 621(a)(2) authorizes a taking of private property, and because the Court believes that the statute does not provide compensation for such a taking, the Court declines to adopt this interpretation of the Cable Act. *See Frisby v. Schultz,* 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (courts should avoid interpreting a statute in a manner which creates substantial constitutional difficulties).

*i. "Takings" Analysis—Private Property without Compatible Easements*

 The parties do not dispute that the Cable Act does not authorize a cable oper-ator to access private property in the absence of public rights-of-way or dedicated easements. Indeed, if section 621(a)(2) were construed as authorizing a cable operator to construct a cable system on private property regardless of the presence of compatible easements, the Court would have little difficulty in determining that the statute constituted a taking in violation of the Fifth Amendment. That situation would be indistinguishable from the situation rejected by the Supreme Court in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) or by the Ninth Circuit in *Century Southwest. See Loretto,* 458 U.S. at 436, 102 S.Ct. 3164 (holding that New York statute authorizing cable companies to access private property in absence of easement or compensation to the owner constituted an unconstitutional taking in violation of the Fifth Amendment); *Century Southwest,* 33 F.3d at 1071 (holding that it is "established law that the intrusion of a cable service onto rental property is a taking of the property, which can only be carried out by public authority for just compensation," and vacating preliminary injunction). Thus, when the government appropriates a land owner's right to exclude an outsider's intrusion onto his or her property, without paying the owner just compensation, the government violates the Takings Clause of the Fifth Amendment.[10]

---

**9.** This is the position presumably adopted by the district court in *Heritage.* In *Heritage,* the district court granted the plaintiff's motion for a preliminary injunction allowing it to access easements on the defendant's property because of their use by a competitor:

> Since [the competitor cable company] will be installing cable television dissemination facilities, the easements, rights-of-way and pathways ... have been dedicated to uses which are compatible with the uses proposed by [the plaintiff].

*Heritage,* 1990 U.S. Dist. LEXIS 18811 at *6. The district court did not address, however, whether this broad interpretation of the term "dedicated" effectively authorizes a taking of the defendant owner's private property by forcing it to allow an outside cable company to access and occupy its private easements.

**10.** The fact that a cable operator, and not the government itself, is seeking to access private property under the Cable Act does not change this analysis. On the contrary, the Supreme Court in *Loretto* noted that "an owner suffers a special kind of injury when a *stranger* directly invades and occupies the owner's property." *Loretto,* 458 U.S. at 436, 102 S.Ct. 3164 (emphasis in original).

Therefore, it is well established under *Loretto,* as well as under *Century Southwest,* that the Cable Act does not authorize plaintiff to access defendant's private property in the absence of easements "dedicated" to compatible uses.

### ii. *"Takings" Analysis—Private Easements on Private Property*

Assuming that Congress may not constitutionally authorize a physical occupation of property where no easement exists, the Court must now determine whether the Cable Act authorizes that exact same occupation based solely on the fact that the owner selectively allows one company (but not others) to use its land.

Addressing this question, the Court fails to see why defendant's easements, which would otherwise be considered private, must be opened for the indiscriminate use of any cable operator in the area without compensation, merely because defendant allowed Cox Cable to access the utility trenches in exchange for a fee. As the Supreme Court noted in *Loretto,* "[t]he power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights." *Loretto,* 458 U.S. at 435, 102 S.Ct. 3164. Thus, regardless of whether the utility trenches on the San Elijo Hills development are compatible with the installation of cable, forcing defendant to allow plaintiff to use them appropriates its right as a land owner to select who to allow on its property and who to exclude. Because the key issue in this case is not the potential burden caused by plaintiff's use of the easements, but rather, defendant's right to exclude outsiders from its property, construing the Cable Act as authorizing access to its private easements would constitute a taking in violation of the Fifth Amendment. *See McNeil,* 953 F.2d at 605; *Loretto,* 458 U.S. at 436, 102 S.Ct. 3164 (noting that regardless of whether the intrusion on the defendant's private property represents a minimal or great financial burden or expense, the government's permanent appropriation of the owner's right to exclude others from property constitutes a taking under the Fifth Amendment.) [11]

---

**11.** Although neither party addressed the issue, it is debatable whether allowing plaintiff access to the trenches at issue in this case would constitute a "permanent physical occupation" as detailed by the Supreme Court in *Loretto.* Unlike the situation in *Loretto,* where the cable operator sought to permanently install cable on private property, there is no dispute that the private easements in this case are intended to be conveyed to the city of San Marcos once it accepts the proposed maps detailing the platted streets. Thus, plaintiff's occupation of the easements at issue in this case may not necessarily be permanent in light of their potential conveyance to the public in the near future.

In *Loretto,* the Supreme Court analyzed the difference between a permanent and a temporary occupation of private property, and provided examples from several cases. Discussing the cases *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) and *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), the Supreme Court noted that easements of passage, being "temporary and limited in nature," are not considered takings *per se. Loretto,* 458 U.S. at 427–435, 102 S.Ct. 3164.

However, in the present case, unlike a "temporary shifting use," plaintiff's use of defendant's easements would constitute a constant physical occupation of that property until all improvements on the development are finalized and the property is conveyed to the public. There is no indication how long a period this may be, or whether the city will in fact accept all the easements in question. Therefore, plaintiff's continued physical occupation of these easements may not necessarily end once the city accepts the formal dedication of streets and easements on the development. Thus, rather than lasting only moments, like the easements of passage at issue in *PruneYard* or *Kaiser Aetna,* plaintiff's occupation of the private property in this case is more analogous to the flooding cases cited by the Supreme Court as examples of permanent occupations. *See Media General Cable,* 737 F.Supp. at 907 n. 8 (discussing *Loretto,* 458

*iii. "Takings" Analysis—Third Party Use of Existing Easements Constitutes a Taking of that Property*

Plaintiff argues that granting it access to defendant's utility trenches under the Cable Act would not constitute a "taking" requiring compensation, because the installation of its cable in defendant's utility trenches will not cause defendant any additional expense or burden. In support of this argument, plaintiff cites *Salvaty v. Falcon Cable Television*, 165 Cal.App.3d 798, 212 Cal.Rptr. 31 (1985) for the proposition that where a cable company's use of a utility easement is no additional burden on the property, no "taking" occurs because the use was within the scope of the easement.

However, a close reading of *Salvaty* demonstrates that the result in that case does not support plaintiff's position. In *Salvaty*, a telephone company obtained a permanent easement on the plaintiff landlord's property. Subsequently, the telephone company leased the use of its easement to the defendant cable company. The defendant, without the permission of the plaintiff, installed cable television facilities on the telephone easement. In a lawsuit brought by the plaintiff, the California Court of Appeal dismissed the case, stating that the defendant's use of its easement did not go beyond the easement's scope, and thus, did not constitute a taking. *See Salvaty*, 165 Cal.App.3d at 805, 212 Cal.Rptr. 31. Therefore, *Salvaty* dealt with the right of a cable company to expand the use of *its own existing easement*. Because the cable company's activities did not go beyond the original scope of the easement, the Court of Appeal held that it did not constitute an *additional* burden on

the property, and thus, did not constitute a taking. *Id.*

In the present case, however, plaintiff is attempting to enter a rival cable company's (Cox Cable) easement without its permission, without the owner's (defendant) permission, and without paying the fee the rival paid to obtain the easement in the first place. The mere fact that plaintiff's use of the trench does not create an additional expense to defendant does not render its use of the easement any less of a taking. As discussed above, although plaintiff's use of the trench may not create an additional burden or expense, forcing defendant to allow plaintiff access to the trench would implicate defendant's fundamental right as a property owner to exclude individuals from its property. *See Loretto*, 458 U.S. at 435, 102 S.Ct. 3164 ("The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights"); *see also Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); *Kaiser Aetna v. United States*, 444 U.S. 164, 179–80, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979).

In granting an easement to Cox Cable, defendant gave Cox Cable—and no others—the specific right to use its property in exchange for a fee. As detailed by the district court in *Media General Cable of Fairfax, Inc. v. Sequoyah Condominium Council*, 737 F.Supp. 903 (E.D.Va.1990), if the Cable Act were interpreted as authorizing access to this private easement, it would essentially condemn the space within the easement for use by plaintiff. This is an additional use of the easement not contemplated by either defendant or Cox Cable. "*Loretto* teaches that such com-

U.S. at 435, 102 S.Ct. 3164, and citing *United States v. Lynah*, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539 (1903)).

More importantly, the relevant question is not whether the application of the term "dedi-

cated" to private easements would result in a taking in this particular case, but rather, whether that interpretation would tend to authorize takings of private property when applied universally.

pelled access, if for a permanent physical occupation, is a taking *per se.*" *See Media General Cable,* 737 F.Supp. at 908.[12]

#### iv. The Cable Act Does Not Provide Compensation for a "Taking"

Even if Congress intended for section 621(a)(2) to authorize a taking of private easements, this section does not provide for compensation, as required to render such a taking constitutional. The legislative history of the Cable Act demonstrates that this omission was intentional, as Congress deliberately stopped short of providing for just compensation to an owner by a cable operator who invades its property in order to use its private easements.

When Congress originally drafted the Cable Act, it included a provision, section 633, which would have given cable operators the right to serve apartment buildings, despite the opposition of the owners of surrounding common areas. Realizing that granting cable operators this right would constitute a taking of the owners' private property rights, Congress explicitly included a compensation provision designed to comply with *Loretto*'s requirements:

> The Committee notes the Supreme Court's decision in the case *Loretto v. Teleprompter,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), striking down a New York state statute affording cable operators access to the premises on the grounds that there was no provision in this statute for granting affected

property owners just compensation for the use of their property. In order to comply with the constitutional requirements set forth by the Court in that decision, this section requires that commission regulations, and any regulations promulgated by a state franchising authority, assure that the owner of any affected premises does receive just compensation.

*See* H.R.Rep. No. 934, 98th Cong., 2d Sess. 80–81 (1984). In order to comply with *Loretto*'s requirements, Congress drafted two provisions in section 633 designed to compensate property owners for the taking of their property. Section 633(b)(1)(D) required that state franchising authorities or the Federal Communications Commission regulate just compensation determinations. Additionally, section 633(d) set forth the factors to be considered in determining the amount of just compensation, including (1) the extent of the physical occupation, (2) long-term damage caused by the occupation, (3) the extent of interference with the normal use of the property, and (4) the enhancement of the property's value due to the availability of cable. *See* H.R.Rep. No. 934, 98th Cong., 2d Sess. 81 (1984).

Thus, section 633 clearly authorized a taking implicating the concerns addressed by the Supreme Court in *Loretto,* and explicitly provided for just compensation for taking the owner's property. However, Congress ultimately rejected this mandatory access provision, and section 633

---

**12.** The Court is mindful that two other district courts analyzing this issue have reached a contrary result. *See Greater Worcester,* 682 F.Supp. at 1259 (finding that because the cable operator's use of the easement was compatible with others' uses, "it is unclear just what property [defendant] suggests will be taken without compensation"); *United Cable Television of Mid–Michigan,* 1989 U.S. Dist. LEXIS 18154 at *8 n. 2 (citing *Greater Worcester,* and stating that if no additional

burden is imposed on an easement, no taking of that property occurs).

However, the Court finds these cases unpersuasive because they fail to address the right of the property owner to exclude individuals from using its private property or easements. *See Loretto,* 458 U.S. at 435, 102 S.Ct. 3164 (minimal burden on private property nonetheless constitutes taking because violates owner's right to exclude); *Media General Cable,* 737 F.Supp. at 908.

was never enacted into law. Although a portion of section 633 providing for damage compensation was eventually added to section 621(a)(2), the key sections providing for just compensation were completely omitted. As detailed by the district court in *Media General Cable*, if Congress intended for the current section 621(a)(2) to provide just compensation for a taking, it would have left the excised portions of section 633 undisturbed, as they governed the actual calculation of just compensation. "Given Congress' concern with *Loretto*, [section 621(a)(2)'s] retention [of damage compensation provisions] without additional provisions detailing the determination of just compensation is persuasive, if not conclusive, evidence that section 621(a)(2)(C) concerns only property damage, not the taking of private property." *Media General Cable*, 737 F.Supp. at 910.

Therefore, although section 621(a)(2) does contain a provision compensating

property owners for damages caused by a cable operator, it does not compensate property owners for government takings of their private property. *See McNeil*, 953 F.2d at 604 n. 2.

#### v. Summary

Because adopting an informal construction of the term "dedicated" would necessarily mean that section 621(a)(2) of the Cable Act authorizes a taking of private property, and because the Court believes that the statute does not provide compensation for such a taking, the Court declines to adopt this interpretation of that section. Instead, the Court finds that section 621(a)(2) only authorizes cable operators to access easements which have been formally dedicated for public use.[13]

### c. Application

 Applying the formal definition of "dedicated" easements adopted above, the

---

13. Plaintiff argues that interpreting section 621(a)(2) as requiring formal dedication, and not authorizing access to private easements, would render the Cable Act irrelevant. Specifically, plaintiff notes that under California law, easements are not "dedicated" until all the improvements are finished and the city accepts the property. *See* CAL GOVT. CODE § 66447. Therefore, plaintiff maintains that the private utility trenches will be paved over before they are conveyed to the city (and become formally "dedicated"), and before it is granted a right to install its cable on easements in the San Elijo Hills development. Because the utility trenches will be paved over before they become "dedicated," plaintiff will be forced to dig its own trenches in the development, tearing up the already finished improvements and disturbing residents in order to install its cable. According to plaintiff, such an "absurd and cost-prohibitive interpretation [of the Cable Act] is inconsistent with Congress' intent" to encourage the growth and development of cable systems. (*See* Pl.'s Mem. of P. & A. in Supp. of Mot. for Prelim. Inj. at 8.)

The Court recognizes that Congress' intent in enacting the Cable Act was generally to expand access to cable across the country and promote competition in the cable industry. *See* 47 U.S.C. § 521. However, there is no indication that Congress intended to go so far as to enact a taking of private property in order to achieve that goal. On the contrary, as discussed above, the legislative history of the Cable Act conclusively demonstrates that Congress considered, and ultimately rejected, authorizing such a taking.

Additionally, the Court is well aware of the general rule against interpreting a statute in a way which renders it null or ineffectual. However, the Court's conclusion that section 621(a)(2) only permits cable operators to access public easements does not render the statute irrelevant. Under the Court's interpretation of section 621(a)(2), cable operators may still force entry into public rights of way and public easements if a land owner attempts to deny them access. *See Media General Cable*, 737 F.Supp. at 912–13 (discussing *Centel Cable Television Co. v. Burg & DiVosta Corp.*, 712 F.Supp. 176 (S.D.Fla.1988), where resort to section 621(a)(2) was necessary to allow a cable operator access to dedicated easements and public rights-of-way).

Court finds that the easements on the San Elijo Hills development have not been formally dedicated. Although San Elijo has filed maps with the city of San Marcos offering to dedicate platted streets to the city, the final dedication of these easements is not yet complete. (*See* Noland Decl. at ¶ 3.) Under California law, easements are not formally dedicated until they have been offered by the development and unconditionally accepted by the city.

> A public entity's interest in streets and easements offered by dedication is necessarily limited by the conditional nature of its acceptance thereof, which depends for finality upon a subsequent acceptance after satisfactory completion of street improvements. A qualified acceptance results in an outstanding offer of dedication .... Until the offer of dedication is unconditionally accepted, no public interest is created.

*Mikels v. Rager*, 232 Cal.App.3d 334, 354, 284 Cal.Rptr. 87 (1991).

There is no dispute that the city of San Marcos has not yet accepted the improvements and that the private easements at issue in this case have therefore not yet been formally "dedicated" for public use.[14] Because it is clear that under California law the private easements on the San Elijo Hills development have not been publicly dedicated, the easements remain private, and plaintiff does not have the right to access them under the Cable Act. Therefore, because the Court finds that section 621(a)(2) does not provide plaintiff a right to access the utility trenches on the San Elijo Hills development, plaintiff has not demonstrated that it has a substantial likelihood of success on the merits.

**2. Irreparable Harm**

■ In its June 22, 2001 order granting plaintiff's motion for a TRO, the Court listed several "irreparable" harms that would result from plaintiff's exclusion from the San Elijo Hills development. (*See* Order Granting Plaintiff's Application for Temporary Restraining Order (6/22/01) at 4–5.) Specifically, the Court noted that if plaintiff was effectively excluded from the development until the easements became public, (1) its goodwill and business prospects would be harmed because it would be forced to dig its own trenches after residents moved into the community, (2) it would be forced to bear the increased cost of digging its own trenches after the original trenches were paved over, and (3) its

---

**14.** Although plaintiff does not dispute that the easements in this case have not yet been formally dedicated, plaintiff does argue that because defendant allowed Cox Cable and SDG & E to access and use the utility trenches on the development (in exchange for an access fee), it has opened up these easements for "general utility use." (*See* Pl.'s Mem. of P. & A. in Supp. of Mot. for Prelim. Inj. at 8.) Thus, plaintiff argues that because defendant opened its property up to "general utility use," it is estopped from denying plaintiff access to the utility easements.

However, the Court believes that defendant made no such relinquishment of its right to exclude; Cox Cable's access to the trenches was clearly premised on the payment of an access fee, and the mere fact that defendant allows certain other utilities on its property does not dictate that it intended to abandon

its authority to exclude others from the property.

As the Eleventh Circuit in *McNeil* noted, every modern apartment building or development is linked to electric, telephone, and television services. Plaintiff's interpretation of the statute would give any company the unfettered right to enter the property and use the easements, without paying the fee on which the other cable operator's access was conditioned, simply because the owner allowed another party access to the property. *See McNeil*, 953 F.2d at 605. Because defendant did not voluntarily relinquish its right as a land owner to exclude others from its property, allowing plaintiff unrestricted access to the easements based on their use by Cox Cable would authorize the same intrusion held to be a taking in *Loretto*. *See id.*

competitor, Cox Cable, would have a significant head start in soliciting subscribers. (*See id.* at 4, 284 Cal.Rptr. 87.)

However, as defendant argues in its opposition, the harms specified in the TRO are not irreparable, and will be suffered only should plaintiff refuse to dig its own ditch, or decline to pay the fee for access to defendant's trenches, before residents move into the development. Thus, defendant claims that the harm to plaintiff in this case consists largely of a financial expense that plaintiff is trying to avoid in order to save money, which is an inappropriate basis for a finding of irreparable harm.

It is true that irreparable harm in this case is not as severe as was suggested by this Court in the TRO, or detailed by the district court in *Heritage*. In *Heritage*, the cable operator was completely excluded during the initial stages of development, and thus, most of the harm discussed in that case arose from its late entry and installation in the housing development. *See Heritage*, 1990 U.S. Dist. LEXIS 18811 at \*8–9. However, in the present case, plaintiff is not truly excluded from accessing the San Elijo Hills development, but rather, must pay a fee in order to access defendant's private utility trenches and complete its cable installation. While the fee in this case may be onerous, and although the Court questions whether the $250 per home charge is truly representative of defendant's cost in excavating the trenches, the burden on plaintiff to pay the fee does not constitute "irreparable harm" sufficient to issue a preliminary injunction.

### CONCLUSION

Accordingly, because the Court finds that plaintiff fails to demonstrate a substantial likelihood of success on the merits or the possibility of irreparable harm, the Court hereby **DENIES** its motion for a preliminary injunction.

**IT IS SO ORDERED.**